### THE STATE *v.* SWIFT.

CONSTITUTIONAL LAW.—*No Amendment of Constitution by a Plurality.— Suffrage.—Judicial Notice.*—An amendment of section 2 of article 2 of the constitution of this State, adopted in 1851, was submitted by the Legislature, to the electors thereof, for ratification, at the spring election of 1880 for township officers, by which amendment a voter would be required, in addition to the residence qualification already existing, to have resided within the township sixty days, and within the precinct thirty days immediately preceding any election at which he might offer to vote. After-ward an indictment was returned against an inspector of an election held subsequent to such election, for refusing to receive a ballot offered thereat, to which the defendant pleaded specially, that, at such spring election, 169,483 votes had been cast for such amendment, and only 152,251 votes against it, and that such elector had not resided within his precinct for thirty days, at the time he offered to vote, as required by such amendment. To this plea the State specially replied, alleging that, at such spring election, 380,471 votes had been cast, and that, therefore, such amendment had received less than a majority of the whole number of votes so cast, and had failed.

*Held*, on demurrer to such reply, that the Supreme Court takes judicial notice of the number of votes cast at a general State election upon all questions of public affairs affecting the State, and, therefore, must know all the facts necessary to the decision of the question whether or not such amendment was ratified.

*Held*, also, that, as section 1 of article 16 of the constitution of 1851 declares, that "it shall be the duty of the General Assembly to submit" any proposed amendment of the constitution "to the electors of the State, and if a majority of said electors shall ratify the same," it "shall become a part of this constitution," and as the amendment had received the votes of less than a majority of all the electors who had voted at such election, though re-ceiving a majority of the votes cast for and against itself, it was neither rati-fied nor rejected, and, under a valid statute, may again be submitted.

SAME.—A proposed amendment of the constitution must, to become a part of that constitution, be ratified by the votes of a majority of the electors of the State ; but the General Assembly may provide that the whole num-

The State *v.* Swift.

ber of votes cast at the election at which such amendment is submitted may be taken as the whole number of electors of the State at that time.

SAME.—The act of March 10th, 1879, providing for the submission of such amendments, was defective in not providing for the count of the aggregate number of votes cast at such election, or in failing to provide some means to ascertain the whole number of votes then cast.

SAME.—*Wabash and Erie Canal Bonds.*—*Res Adjudicata.*—Section 7 of article 10 of the State constitution, ratified at the election authorized by the act of January 28th, 1873, Acts 1873, p. 83, is a valid amendment, as the matters connected with its submission and ratification are *res adjudicatæ.* NIBLACK and SCOTT, JJ., dissented and filed opinions.

From the Floyd Circuit Court.

*T. W. Woollen,* Attorney General, *D. Turpie, J. V. Kelso, E. P. Ferris* and *W. W. Spencer,* for the State.

*J. H. Stotsenburg, A. C. Harris, R. Hill, J. Coburn, J. M. Butler, W. H. H. Miller* and *S. Claypool,* for appellee.

BIDDLE, C. J.—The appellee, on the 12th day of May, 1880, was indicted as an inspector of an election, for refusing to receive the vote of an elector.

The indictment charges, that on the 4th day of May, 1880, in the city of New Albany, an election was held for the purpose of electing a common councilman, at the voting precinct of the sixth ward in said city; that the appellee was duly appointed an inspector at said election, and acted as such; that one James V. Kelso, who was then and there a legal and qualified voter of said precinct, and entitled to vote at said election, offered his vote at said precinct, to the appellee as inspector of said election, and that the appellee, as such inspector, unlawfully, knowingly and wilfully refused to receive said vote of the said Kelso, offered as aforesaid.

No question is made as to the sufficiency of the averments in the indictment.

The appellee pleaded not guilty to the charge, and also answered the indictment specially, admitting that the election was held, that the appellee was an inspector, and that the vote was offered and refused, as charged in the

indictment; but averring, that, at the time the vote was offered, Kelso had not been a resident in the said precinct for the period of thirty days immediately preceding such election; neither had he been duly registered as a voter. The special answer also avers, that, before the time of holding said election, the following amendment to the constitution of the State of Indiana was proposed in the senate of the General Assembly of the State, at its session in the year 1877, namely:

" *Resolved, by the Senate, the House of Representatives concurring,* That the following amendment be and is hereby proposed to the constitution of the State of Indiana, to wit:

" Amend section 2 of article 2, so as to read as follows:

" Section 2. In all elections, not otherwise provided for by this constitution, every male citizen of the United States of the age of twenty-one years and upwards, who shall have resided in the State during the six months, and in the township sixty days, and in the ward or precinct thirty days, immediately preceding such election, and every male of foreign birth, of the age of twenty-one years and upwards, who shall have resided in the United States one year, and shall have resided in the State during the six months, and in the township sixty days, and in the ward or precinct thirty days, immediately preceding such election, and shall have declared his intention to become a citizen of the United States, conformably to the laws of the United States on the subject of naturalization, shall be entitled to vote in the township or precinct where he may reside, if he shall have been duly registered according to law."

That the same was agreed to by a majority of the members elected to each of the two houses of the General Assembly, and the same proposed amendment was, with the yeas and nays thereon, entered on the

journals of the two houses, and referred to the General Assembly to be chosen at the next general election; and that, in the next General Assembly so next chosen, and at its session in the year 1879, the said proposed amendment was agreed to by a majority of all the members elected to each house, and thereupon the General Assembly, by the act of March 10th, 1879, submitted the said amendment to the electors of the State, at the election to be held on the first Monday of April, 1880, for their adoption or rejection thereof; that at said election the said proposed amendment received in favor of the ratification thereof 169,483 votes, and 152,251 votes against the ratification of said amendment, leaving a majority in favor of the ratification of said amendment of 17,232 votes, whereby a majority of the electors of the State, who voted at said election for or against the ratification of said amendment, voted for the ratification thereof; by reason whereof the said amendment became, and has ever since been, a part of the constitution of the State of Indiana; and therefore the said James V. Kelso, at the time he so offered his vote, was not a qualified voter of the State of Indiana.

A demurrer for the want of facts was overruled to the above special plea, whereupon the State replied specially, admitting that the number of votes cast in favor of and against the ratification of the amendment was as stated in the answer, but adding that the whole number of votes cast at said election was 380,471; that, by official enumeration, taken according to law, the number of voters of the State of Indiana, in the year 1877, was 451,028; that the number of votes cast at the gubernatorial election in 1876, was 434,006, and that there was an equal number of legal voters in the State of Indiana on the 5th day of April, 1880, all of which is specifically alleged.

To this reply a demurrer for the want of facts was sustained. The defendant was then tried by the court, on

his plea of not guilty, and acquitted. Judgment accordingly, from which the State appeals on a reserved question.

By the exceptions entered below, and the assignments of error in this court, the State presents two questions for our consideration:

1. Was the proposed amendment, according to the facts stated in the reply to the special answer, ratified by a majority of the electors of the State, and did it thereby become a part of the constitution? and,

2. If such proposed amendment was so ratified, was James V. Kelso a legal voter of the precinct named in the indictment, at the time he presented his ballot to the appellee and offered to vote?

A doubt is suggested *in limine*, by the counsel for the appellee, as to whether the general question of the ratification of the constitutional amendment is properly presented by the record. They insist that proof, or admitted facts in the individual case, as to the whole number of votes cast at the election of April 5th, 1880, and the number cast for and against the amendment, do not present the general question; and that one decision therefore would bind only the parties to this suit, and would not become matter of public law upon the question of the ratification of the amendment. But we do not feel embarrassed with this question. The courts take notice of the public census taken by authority of law, of the archives of the State, and of the number of votes cast at a general State election, upon all questions of public affairs that affect the State. From these sources we must know all the facts necessary to the decision of the question whether the amendment is constitutionally ratified or not. In our opinion, the questions discussed by the counsel of the respective parties are properly in the record and before us.

By the 1st section of the act of Congress of April

19th, 1816, the inhabitants of the territory of Indiana were authorized to form for themselves a constitution and state government, which state, when formed, should be admitted into the Union upon the same footing with the original states.

The 2d section defines the boundaries of the State.

Section 3 prescribes the qualifications of electors and authorizes them to choose representatives to form a convention, defines the number allowed to each county, and fixes the time of holding the election on the second Monday of May, 1816.

The 4th section is in the following words :

" Sec. 4. *And be it further enacted,* That the members of the convention, thus duly elected, be, and they are hereby, authorized to meet at the seat of government of the said territory on the second Monday of June next ; which convention when met, shall first determine, by a majority of the whole number elected, whether it be or be not expedient, at that time, to form a constitution and state government for the people within the said territory ; and if it be determined to be expedient, the convention shall be, and hereby are, authorized to form a constitution and state government; or if it be deemed more expedient, the said convention shall provide by ordinance for electing representatives to form a constitution or frame of government, which said representatives shall be chosen in such manner, and in such proportion, and shall meet at such time and place, as shall be prescribed by the said ordinance ; and shall then form for the people of said territory, a constitution and a state government : *Provided* that the same, whenever formed, shall be republican, and not repugnant to those articles of the ordinance of the thirteenth of July, one thousand seven hundred and eighty-seven, which are declared to be irrevocable between the original states and the people and states of the territory north-west of

the river Ohio ; excepting so much of 'said articles as relates to the boundaries of the states therein to be formed." R. S. 1843, p. 33 ; 2 R. S. 1876, p. 709.

Under this act, the members of the convention were elected on the second Monday of May, 1816, met in convention at Corydon on the second Monday of June, 1816, and proceeded at once to form the constitution, by the authority of Congress, without an ordinance of the territory. The constitution was completed on the 29th day of June, 1816, unanimously adopted by the members of the convention, forty-three in number, and signed by all except one member from Clark county, and one member from Warrick county. The constitution went into effect upon its adoption by the members of the convention which formed it, and the first session of the General Assembly, held by its authority, met at Corydon on the first Monday of November, 1816. The constitution of 1816 remained in force, without amendment, until the first day of November, 1851.

An act was passed January 15th, 1849, "to provide for taking the sense of the qualified voters of the State on the calling of a convention to alter, amend, or revise the constitution of this State." At an election held under the authority of this act, "a large majority of all the votes given at said election was in favor of holding said convention." The Legislature was unwilling even to call the convention, without first obtaining the authority from a majority of all the voters of the State.

On the 18th day of January, 1850, the Legislature passed an act to provide for the call of a convention of the people of the State of Indiana, " to revise, amend, or alter the constitution of said State." Acts 1850, p. 29. By the authority of this act, delegates were elected, who assembled in convention at the capitol, in the city of Indianapolis, on the first Monday of October, 1850, and completed the

labor of forming the present constitution on the 10th day
of February, 1851. By the thirteenth clause of the sched-
ule to this constitution, it was provided that, when it was
submitted to the electors for their approval or disapproval,
the article in relation to negroes and mulattoes should be
submitted as a distinct proposition; "And if a majority
of the votes cast shall be in favor of said article, then the
same shall form a part of this constitution; otherwise, it
shall be void, and form no part thereof."

On the 14th day of February, 1851, an act was passed
amending the act of January 18th, 1850, providing that a
vote of the people should be taken on the first Monday in
August thereafter, on the adoption or rejection of the con-
stitution and said separate article, the 4th section of
which amendatory act provides, that, "If it shall appear that
a majority of all the votes polled at such election were given
in favor of the adoption of said constitution, it shall then
become the constitution of the State of Indiana from
the 1st day of November, 1851; but if it shall appear that
a majority of all the votes polled for or against the adop-
tion of said constitution and said separate article, were given
against the adoption of said constitution, then the same
shall be and remain inoperative and void." Acts 1851, p. 53.

Section 1, art. 16, of the constitution, by the authority
of which the amendment in question was proposed by the
General Assembly for ratification by the electors of the
State, is in the following words :

"Any amendment or amendments to this constitution
may be proposed in either branch of the General Assem-
bly, and, if the same shall be agreed to by a majority of
the members elected to each of the two houses, such pro-
posed amendment or amendments shall, with the yeas and
nays thereon, be entered on their journals and referred to
the General Assembly to be chosen at the next general
election; and if, in the General Assembly so next chosen,

such amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the General Assembly to submit such amendment or amendments to the electors of the State; and if a majority of said electors shall ratify the same, such amendment or amendments shall become a part of this constitution."

The first amendment proposed and ratified under this article of the constitution was section 7 in article 10, in reference to the Wabash and Erie Canal. By the act of the General Assembly, of January 28th, 1873, Acts 1873, p. 83, the Governor and Secretary of State were required to examine the election returns, and declare the result of the election; "and if it shall appear from said examination that a majority of all the votes cast at said election were in favor of the adoption of said proposed amendment, then, and thereupon, the said amendment shall be and become a part and parcel of the constitution of the State of Indiana, and the Governor of this State shall, as soon as practicable, issue his proclamation, embodying the said amendment therein, and declaring and proclaiming that the same has been duly ratified by the people, and is therefore a part of the constitution of the State."

In pursuance of this act, the Governor and Secretary of State declared the returns of the election, and the Governor issued his proclamation, declaring that the proposed amendment had received the requisite constitutional majority in its favor, necessary to its ratification, and had become a part of the constitution of the State, as section 7 of article 10 thereof, which section is now printed by authority in the constitution. The matter, therefore, having been decided and proclaimed, according to law, by the executive department, a co-ordinate branch of the government, has now become *res adjudicata.*

By the 1st section of the act of March 10th, 1879, it is declared that each of said proposed amendments shall be submitted to the electors of the State at the election to be held on the first Monday of April, 1880, for their adoption or rejection.   Section 3 provides that "Any qualified elector, at the time he votes for officers, or at such election, if he does not vote for any officer, may vote for or against any amendment, by depositing one of said ballots in the ballot-box."   The same section also provides that, "If a majority of the electors shall thus ratify any of said amendments, the same shall be a part of the constitution; but no elector shall vote more than once, and if he votes for any officer, shall at the same time vote on such amendments."   Acts 1879, p. 25.

The above statement shows that, by the act of Congress, it required "a majority of the whole number elected," of the members of the convention, to decide upon the expediency of adopting the constitution of 1816; and that, by the act of the Indiana Legislature, it required "a majority of all the votes polled at such election" to adopt the constitution of 1851.   It also appears that it required "a majority of all the votes cast" to ratify article 13 of the constitution of 1851, which was submitted to the electors as a separate proposition; and that it requires "a majority of the members elected to each of the two houses" of the General Assembly, at two successive regular sessions, to propose an amendment or amendments to the constitution, and, when so proposed, "it shall be the duty of the General Assembly to submit such amendment or amendments to the electors of the State; and if a majority of said electors shall ratify the same, such amendment or amendments shall become a part of this constitution." And, by section 25 of article 4 of the constitution, it requires "A majority of all the members elected to each house" to pass a bill or joint resolution.

We can find no authority, either in the constitution of 1816, or in the constitution of 1851, or in the legislative acts upon the subject, by which a constitution, or any of its separate articles, or any amendment thereto, could be adopted or ratified by a plurality of votes of the electors, or by any less number than a majority of the whole number cast at that election. If there are any doubts of the construction, upon its face, of the section under which the amendment before us was proposed, they would disappear upon the examination of the debates in the convention which formed the constitution. The proposition was first introduced, substantially, in the words in which it ultimately passed. After receiving some discussion and several amendments, it was referred to the " committee on future amendments to the constitution." This committee reported a section as follows:

" Whenever two-thirds of all the members elected to each branch of the General Assembly shall think it necessary to call a convention to alter or amend this constitution, they shall recommend to the electors at the next election of members of the General Assembly, to vote for or against a convention; and if it shall appear that a majority of all the electors of the State voting for representatives have voted for a convention, the General Assembly shall, at their next session, call a convention for the purpose of revising, altering, or amending this constitution." A second section was then offered, authorizing two-thirds of the members of the two houses of the General Assembly to propose amendments to the constitution, and, when thus proposed, to submit them " to the people at the next general election for their adoption or rejection, in such manner as may be prescribed by law; and if a majority of all the electors voting at said election for members of the House of Representatives shall vote for such amendment or amendments, the same shall become a part of the constitution."

Mr. Owen, of Posey, then offered a substitute, in almost the exact words in which it now stands in the constitution. This substitute was fully discussed by leading members of the convention, and accepted by a large majority. It was then put upon its passage, carried, and referred to the committee on revision. This committee changed the phraseology of the section slightly, by substituting the words "General Assembly" for the words "Senate" and "House of Representatives," and the word "electors," in one instance, instead of the words "qualified voters;" and it was then adopted as it now stands, as a part of the constitution of 1851. 2 Const. Debates, 1258-1260, 1913-1918, 1938-1940.

This examination of the Constitutional Debates shows the affirmative sense of the convention to have been that amendments to the constitution could be adopted only by the majority of the electors of the State. The proceedings also show us that a contrary proposition was ultimately rejected. The section, as first introduced by Read, of Clark, required " a majority of the qualified voters " to adopt an amendment to the constitution. Stevenson moved to amend the section, by inserting the words " a majority of all the votes cast for or against the same." This amendment was accepted, and in that form the section was referred to the committee, and reported to the convention, as we have seen, without the Stevenson amendment. Mr. Owen's amendment, still without the Stevenson amendment, as we have also seen, was substituted for the section reported by the committee, and became a part of the constitution. 2 Const. Debates, 1258-1260.

We may thus ascertain the expressed intention of the framers of the constitution, affirmatively, that it should require a majority of all the electors of the State to adopt an amendment to the constitution; and also their expressed

intention, negatively, that "a majority of all the votes cast for or against the same," unless such a majority was a majority of all the electors, should not be sufficient to ratify an amendment. The act of the Legislature, by which the amendment under consideration was submitted to the electors of the State, for their ratification or rejection, in this respect, follows the constitution and affirms the same principle. The title of the act is "An act providing for the submission to the electors of the State of Indiana for ratification the constitutional amendments proposed," etc.; and it declares, that, "If a majority of the electors shall thus ratify any of said amendments, the same shall be a part of the constitution."

A distinction will be observed in the constitution, as well as in the acts of the Legislature, between voting to adopt the constitution or to ratify an amendment to the constitution, and voting to elect an officer. The constitution requires a majority of all the votes to ratify an amendment, but, to elect an officer, it requires only the highest number of votes, or a plurality. Sections 4 and 5 of article 5 of the constitution, providing for the election of governor and lieutenant-governor, declare that, "In voting for governor and lieutenant-governor, the electors shall designate for whom they vote as governor, and for whom as lieutenant-governor," etc., and that "The person, respectively, having the highest number of votes for governor and lieutenant-governor, shall be elected." This difference in language between the highest number of votes and a majority of all the votes is not the mere accident of composition; the words are used advisedly. So the Legislature, doubtless, can provide by law for the election of officers, or the ratification of a constitutional amendment by a plurality of votes, when there is no constitutional prohibition.

Section 3 of article 7 of the constitution, providing for

the election of supreme judges, declares that "One of said judges shall be elected from each district, and reside therein; but said judge shall be elected by the electors of the State at large." In this provision, in reference to the election of an officer, the phrase *majority of the electors* is not used, as it is in the section in reference to the ratification of an amendment to the constitution. We must suppose that the framers of the constitution meant just what, in plain words, they said; and that the people who ratified their labors understood them in the same sense.

In the 15th clause of the schedule of the constitution, authorizing a new county to be created out of territory contiguous to the counties of Perry and Spencer, it is provided that, "if a majority of all the votes given at said election shall be in favor of the organization of said new county, it shall be the duty of the General Assembly to organize the same." In the constitution, and throughout the legislation of the State, we believe without exception, whenever a majority of all the votes is required to carry a measure, it is so stated in substantial words; and, when a plurality of votes is sufficient to elect an officer, it is declared that whoever shall receive the highest number of votes shall be elected, or that the electors shall elect the officer, without stating that it shall require a majority of the electors to make a choice.

The people of a State may form an original constitution, or abrogate an old one and form a new one, at any time, without any political restriction except the constitution of the United States; but if they undertake to add an amendment, by the authority of legislation, to a constitution already in existence, they can do it only by the method pointed out by the constitution to which the amendment is to be added. The power to amend a constitution by legislative action does not confer the power to break it, any more than it confers the power to legis-

late on any other subject, contrary to its prohibitions. *Collier* v. *Frierson*, 24 Ala. 100.

With these constitutional provisions and legislative enactments before us, forming a line of precedents running from and since the foundation of the State, to hold that a plurality, or a majority of a part instead of all the electors, could ratify an amendment to the constitution—a far more important act than the proposal of the amendment, or the passage of a bill which is repealable—would be a departure from the line of safe reasoning and logical sequence, and contrary to the constitution and the laws.

The principle of plurality contended for by the counsel for the appellee frequently develops sufficiently glaring disproportions between the number of electors of a constituency and the number of votes cast sufficient to elect; but, when applied to the ratification of a constitutional amendment, and pushed to an extreme, it runs into absurdity. The election of an officer affects the rights of no one except the person elected. To him it grants a privilege. to be exercised for the public good, the exercise of which is a public necessity. It does not affect the right of even the person defeated, but only denies him a privilege which can not be granted except by an election. In such case the constitution requires only the highest number of votes to elect, though it may be only a plurality of a very inconsiderable number of the electors, in proportion to the whole number. But the ratification of a constitutional amendment affects the rights of millions of people who are not electors and who can not vote, and for an indefinite time, until the amendment shall be abrogated by the same power that made it. In such case the constitution requires a majority of all the electors to ratify the amendment. The principle of plurality, which might ratify a constitutional amendment, irrepealable by legislative action, binding the rights of two millions of people, for an

indefinite period, by a vote of two electors against the vote of one, when the whole number of votes cast were but three, is not only unconstitutional, but it is dangerous to human rights, and repugnant to the sense of mankind. As the adoption of a constitution is the considerate act of an entire people, and as it binds all departments of the government, and can not be repealed except by the same power that made it, its adoption should not be left to the vicissitudes of a meagre plurality of votes, which the accidents of a day might cast one way or the other.

We have thus seen that there is no analogy between electing an officer and ratifying a constitutional amendment; nor is there any analogy between the cases cited on behalf of the appellee, wherein taxes are assessed, or franchises granted, by the vote of the majority of the electors, and the ratification of a constitutional amendment. In such cases the taxes assessed and the franchises granted affect the rights of but few persons relative to the whole number of the people, and are temporary in their nature; while the ratification of a constitutional amendment permanently affects the entire body politic. And the comparison of a vote of the members of a private corporation, which can affect only the corporation and its property, with the vote of the electors of a State upon an amendment to the constitution, which affects the rights of all the people of the State, does not come to us with any force as an argument, nor throw any light that we can see, upon the question before us.

If an amendment to the constitution could be proposed by the General Assembly, and adopted by a mere plurality of votes, however small the whole number cast might be, such as is sufficient to elect members of the General Assembly, the constitution would have no more permanence or force than a legislative act, and would thus be rendered useless as a fundamental, irrepealable,

supreme law, to resist unconstitutional action, either by the legislative, judicial or executive departments of the State government. Indeed, such a principle would leave the General Assembly politically omnipotent, in spite of the constitution. The argument of counsel for the appellee seems to confound the distinction between the constitution and a legislative act; and the authorities they cite apply solely to legislative enactments, where there is no constitutional prohibition, and not to the supreme law of the constitution itself.

The appellee's counsel rely upon the case of *Gillespie* v. *Palmer*, 20 Wis. 544. In that case the plaintiff was a citizen of African descent. He brought his action against the inspector of the election for refusing to allow him to have his name registered as an elector, averring that, in pursuance of the constitution and laws, the question whether the right of suffrage should be extended to persons of African descent had been submitted to the electors of the State, and that a majority of the votes cast upon that question was in favor of such extension, but admitting that such majority was not a majority of all the votes cast at such election.

A demurrer for want of facts was sustained to the complaint. On appeal to the Supreme Court, the judgment was reversed. This case presents a question similar to the one we are considering, and, if the constitutions of the two States were the same upon this point, the decision would be entitled to great respect as an authority in the present case.

Section 1 of article 3 of the constitution of Wisconsin defines who shall be electors, but does not include persons of African descent. But in this section there is a proviso, " that the Legislature may at any time extend by law the right of suffrage to persons not herein enumerated; but no such law shall be in force until the same shall have

been submitted to a vote of the people, at a general election, and approved by a majority of all the votes cast at such election."

Section 1 of article 12 of the constitution of Wisconsin, providing for amendments, is expressed in almost the same words as section 1 of article 16 of the constitution of Indiana, under which the amendment before us was proposed, differing in nothing essential except that under the constitution of Wisconsin amendments may be ratified "by a majority of the electors voting thereon," instead of by a majority of the electors of the State.

It is plain that these two provisions in the constitution of Wisconsin, upon the question of extending the right of suffrage by a legislative enactment, and by an amendment to the constitution, are in apparent conflict. It was, therefore, the duty of the supreme court to harmonize the two sections, and give uniformity to the constitution by construction.

The court very properly said: "The right of suffrage by such amendment could be given to colored persons. Is it probable that the framers of our constitution required more votes to extend the right of suffrage in one way than in another? More votes to approve an act of the Legislature conferring the right when so approved, than to make and approve any and all amendments of the constitution, including that conferring suffrage on colored persons? We see no reason for such a conclusion."

This is sound judicial reasoning; and it conducted the court to the only judgment it could render without impairing a constitutional provision; but, as the two constitutions are fundamentally different, as to the proportion of votes necessary to ratify an amendment, the decision can not be held as an authority in the present case.

As the adoption of an amendment to a constitution is of rare occurrence, but few cases upon the question have

been presented for judicial decision; indeed, we have been able to find only the single case above cited presenting a similar point to that before us. There are many cases upon question of levying taxes, granting privileges, establishing county seats, and electing officers, wherein the question of majorities and pluralities are discussed, but very few upon the ratification of constitutions, or constitutional amendments. We must therefore mainly rely upon the precedents and practices found in the history of our own State. *The State* v. *Winkelmeier*, 35 Mo. 103; *Bayard* v. *Klinge*, 16 Minn. 248; *Taylor* v. *Taylor*, 10 Minn. 107; *The People* v. *Warfield*, 20 Ill. 160; *The People* v. *Wiant*, 48 Ill. 263.

The appellee's counsel refer us to the legislative and executive construction given to the act of January 28th, 1873, under which section 7 of article 10 of the constitution was submitted to the electors of the State, in aid of our construction of section 1 of article 16. The construction of a legislative act by the co-ordinate branches of the government is entitled to great respect from this court; but the act of March 10th, 1879, under which the present amendment was submitted to the electors, is so different from the act of January 28th, 1873, that we can derive but little aid therefrom. In the former act there was but the single question of the ratification or rejection of the amendment submitted to the electors; the Governor and Secretary of State were authorized to declare the result of the election; and, if it appeared " that a majority of all the votes cast at said election was in favor of the adoption of said proposed amendment," then the Governor was to proclaim that " the same was duly ratified by the people." The Governor did so proclaim, and no one questioned his decision. The question is therefore settled. At the time of submitting the present amendment to the vote of the electors of the State, under the latter act, other questions

were also submitted, and the Governor, by the act, had no power to declare whether the amendment had been adopted or rejected. Nor does the latter act provide any means by which the whole number of votes cast at that election can be ascertained.

The argument of appellee's counsel, that, if a majority of all the electors of the State was necessary to the ratification of the amendment, it was necessary to provide by the act of March 10th, 1879, for a vote against the ratification, and that, as the law provides for a negative vote, it indicates the intention of the Legislature that a plurality of affirmative votes over the negative votes should be sufficient to ratify the amendment, is answered by section 2 of article 16 of the constitution, which requires : " If two or more amendments shall be submitted at the same time, they shall be submitted in such manner, that the electors shall vote for or against each of such amendments separately." Nor do we now decide, if the act provided that a plurality vote in favor of the amendment should be sufficient to ratify it, that it would have been valid against section 1 of article 10 of the constitution, which declares that, if a majority of the electors of the State shall ratify an amendment, it shall become part of the constitution.

The counsel for the appellee have reminded us of the momentous nature of the question we are considering, and suggested the disastrous consequences which, as it appears to them, must follow to the social, municipal and political interests of the State, if our decision should be adverse to their client. We are not impressed with the force of this argument to a court. Courts know nothing of policy or expediency. It is their duty to understand the constitution and the laws, and uphold them by their decisions ; nor do we see any danger of disaster in the discharge of a plain duty. History and experience prove that disasters follow a disregard of constitutions and laws, and that peace,

liberty and prosperity are secured by obedience to them. As the constitution is the foundation of government, and the bulwark which protects the governed in all human interests, and as its ratification is the most solemn political act of a people, in making changes therein or amendments thereto, which are irrepealable by legislative action, the letter and the spirit of the constitution and the laws must be complied with, or the amendment so proposed can not be regarded as a part of the original instrument.

The great advantage, as is supposed, that will arise to the people from the ratification of the amendment, is also urged upon us as an argument. Of advantages or disadvantages it is not our province to judge. The question for us to decide is, has the amendment been ratified or not? The people of the State of Indiana do not desire advantages obtained at the expense of the constitution; and no conceivable advantages could compensate them for a breach of the fundamental law of the State. They would pay dearly, indeed, for the advantage of an immediate decision of this court that the amendment was ratified, if it had to be made in violation of the constitution and the law.

This court holds that it requires at least a majority of all the votes cast at the same election to ratify a constitutional amendment. We also hold that, as the act of March 10th, 1879, is defective in not providing for the count of the aggregate number of votes cast throughout the State on the day of the election, or in not providing some means to ascertain the whole number of votes cast, by which it might be learned what proportion the number cast in favor of the ratification bore to the whole number, there is no source from which this court can ascertain whether the amendment received a majority of all the votes cast at the election or not. As the amendment was submitted upon the day of the general spring elections throughout the State, and as there were, by law, officers to

elect at the same time in the various counties, it must be presumed that other votes than those for or against the amendment were cast at the same time. From the peculiar ballots used in voting upon the amendment, many electors may have voted "no" and "yes," which votes upon the question of the amendment would not be counted; such, also, should be counted in estimating the whole number of the electors voting; but the law does not provide for certifying them up. It is also held that the constitution must remain as it was before the amendment was submitted, until it shall affirmatively appear that the amendment is ratified. As it does not thus affirmatively appear, we must hold that the amendment is not ratified by a constitutional majority. The opinion, therefore, of this court is, that it requires a majority of the electors of the State to ratify an amendment to the constitution, but that the whole number of votes cast at the election at which the amendment is submitted may be taken as the number of electors of the State.

The writer of this opinion, speaking for himself only, holds that it requires the votes of a majority of the electors of the State to ratify a constitutional amendment. He thinks that this is not only the plain meaning of the words used in section 1 of article 10 of the constitution, but that it was also the manifest intention of the framers of the constitution, as ascertained by the proceedings of the convention. He also holds that the number of electors of a State is a public fact which the courts must ascertain, without averment or proof, whenever it is necessary to the decision of a cause. For this purpose a court may look to the archives of the State, to the official returns of general State elections, to legislative action, and to the proclamations of the executive. He does not mean that a court must know the exact number of electors of the State, to a unit; this is impossible, for the number, on account of

The State *v.* Swift.

deaths and coming of age, is not the same during any twenty-four hours; and what is impossible to do is not required to be done.   The practical meaning of the phrase " all  the electors of the State " is that substantial number whô vote at general State elections, and the number of whose votes is officially returned by sworn officers, into the office of the Secretary of State.   This number need not necessarily include electors who are sick, absent from the State, or prevented from going to the polls.   The construction must be such as has a sensible application to the affairs of men, rather than one of abstract numbers or theory.   The history of a State, the number of inhabitants, and its official statistics are public facts known to all persons, and never need to be averred or proved in judicial proceedings.   He also holds, that, if the whole number of votes cast at a given election should be less than the whole number of the electors of the State thus interpreted, the latter number, being the constitutional guide, would govern the former, having only the authority of legislative action; for the number cast might ·bear a very inconsiderable proportion to the whole number of electors in the State.

In the opinion of this court, the consequences spoken of in argument, of this decision, can at most be but a temporary inconvenience.   We perceive no irregularity in the proposal of the amendment· for ratification.   It has simply not been ratified and not been rejected. The vote upon it was ineffectual for want of the constitutional majority. We see no reason why the General Assembly may not resubmit the amendment to the electors of the State, under an amended act, such as experience may prove to be sufficient to present the question to the courts, if it ever should arise again.

NOTE.—NIBLACK, J., and SCOTT, J., dissent, and will prepare dissenting opinions hereafter.

The court below erred. We sustain the appeal, at the costs of the appellee.

Petition for a rehearing overruled.

## DISSENTING OPINION.

NIBLACK, J.—I regret the necessity which constrains me to dissent from the conclusions at which the court has arrived in this case. I make no question upon the merely historical facts recited by the court, nor do I dissent from many of the abstract propositions announced in its opinion. My disagreement has reference only to matters directly connected with the real question before us, and not to things merely introductory of, or collateral to, that question.

I agree, without reservation, that an amendment to the constitution must be submitted to the electors of the State, and that a majority of such electors must ratify such an amendment, before it can become a part of the constitution. But how that majority is to be ascertained, is the important question now presented for our decision.

McCrary, in his American Law of Elections, at section 183, says: "Where a statute requires a question to be decided, or an officer to be chosen, by the votes of 'a majority of the voters of a county,' this does not require that a majority of all persons in the county entitled to vote shall actually vote affirmatively, but only that the result shall be decided by the majority of the votes cast, provided always that there is a fair election, and an equal opportunity for all to participate. In such a case the only proper test of the number of persons entitled to vote is the result of the election as determined by the ballot-box; and the court will not go outside of that to inquire whether there were other persons entitled to vote who did not do so. The voters of the county referred to by all such statutes are necessarily the voters who vote at the election,

since the result in each case must be determined by a count of the ballots cast, and not by an inquiry as to the number not cast. This doctrine is well settled by the authorities."

In Cooley's Constitutional Limitations, p. 619, it is said: " Unless the law under which the election is held expressly requires more, a plurality of the votes cast will be sufficient to elect, notwithstanding these may constitute but a small portion of those who are entitled to vote, and notwithstanding the voters generally may have failed to take notice of the law requiring the election to be held."

Dillon, in his work on Municipal Corporations, at section 215, says: " The common law principle, that if an act is to be done by an indefinite body it is valid, if passed by a majority of those present at a legal meeting, no matter how small a portion they may constitute of the whole number entitled to be present, has been deemed applicable to the towns of New England. In those towns the corporate power resides, as we have seen, in the inhabitants, or citizens at large, and these form the constituent body. If the meeting has been duly called and warned, those who assemble, though less than a majority of the whole, have the power to act for and bind the whole, unless it is otherwise provided by law. Those who remain away are justly and conclusively presumed to assent to what may lawfully be done by those who attend."

Cushing, in his treatise on Parliamentary Law, devotes considerable space to the law of elections, a subject with which legislative bodies have often much to do, and concerning which, in many cases, they are the exclusive judges. In paragraphs 117, 120 and 131, he lays down certain rules, as follows:

" 117. The term majority, that is, the greater number, is understood in this country in two significations. In its broadest sense, it denotes the greatest of any number of

unequal divisions of the whole body; in its strictest, the greater of any two unequal divisions of the whole body. In the popular elections of this country, both these principles are practically applied; the first being known as the principle of plurality; the other only as that of majority.

"120. In order to determine the result of an election, on the principle of an absolute majority, it is necessary in the first place, to ascertain the whole number of persons who have voted; which, if the suffrages are taken orally, is effected by counting the names on the poll-book; or if the voting is by ballot, by counting the number of ballots.

"131. In connection with this subject, it may be observed, that where there are but two sides to a question,—as for example, where a proposition is made in a deliberative assembly, and the members vote for or against it,—or where a particular person is nominated for office, and the electors vote for or against him, —or where an election of one out of two given persons is to be made,—in all these cases, the majority and plurality are one and the same thing."

The constitution of Missouri, which went into effect July 4th, 1865, contained a provision as follows:

" The General Assembly shall not authorize any county, city, or town to become a stockholder in, or to loan its credit to any company, association or corporation, unless two-thirds of the qualified voters of such county, city, or town, at a regular or special election to be held therein, shall assent thereto." Sec. 14, art. 11.

Under an act of the Missouri Legislature, approved March 23d, 1868, known as the " Township Aid Act," Camp Branch township, of Cass county, in that State, voted by a two-thirds vote of all the votes cast, to issue its bonds to the St. Louis and Santa Fe Railroad Company, and bonds were issued accordingly. Suit was after-

ward brought against Cass County, as the trustee of the township, to recover interest overdue on one of the bonds. The county answered, that, although more than two-thirds voted at the election, two-thirds of the qualified voters of the township did not vote, in favor of issuing the bonds.

The Supreme Court of the United States, in ultimately passing upon the question thus raised, after reviewing and citing a great many authorities relating to the general subject, announced its conclusion as follows :

" This we understand to be the established rule as to the effect of elections, in the absence of any statutory regulation to the contrary. All qualified voters who absent themselves from an election duly called are presumed to assent to the expressed will of the majority of those voting, unless the law providing for the election otherwise declares. Any other rule would be productive of the greatest inconvenience, and ought not to be adopted, unless the legislative will to that effect is clearly expressed." *County of Cass* v. *Johnston,* 5 Otto, 360 ; *St. Joseph Township* v. *Rogers,* 16 Wal. 644 ; Angell & Ames Corp., sections 499, 500 ; *Louisville, etc., R. R. Co.* v. *County Court,* 1 Sneed, 637, 692 ; *Talbot* v. *Dent,* 9 B. Mon. 526 ; *The State, ex rel.,* v.*Renick,* 37 Mo. 270; *The People* v. *Warfield,* 20 Ill. 160.

Other authorities to the same effect might be cited, but I deem it unnecessary to extend the list already given.

The rule laid down as above, by the Supreme Court of the United States, the highest court in this country, appears to be a general rule applicable alike to all classes of popular elections, and to be overwhelmingly sustained by the weight of authority.

I think it may be safely stated, as a rule of law in American elections, that, where a majority vote is necessary to carry an election, a majority of all the votes cast is sufficient, unless there be some statutory or constitutional provision to the contrary.

But it is objected that the construction given as above to statutes governing certain elections has no proper application to constitutional provisions, and especially to cases like the one before us. I am unable to see the force of that objection. It is doubtless fair to assume, that greater care and deliberation are observed in the use of words when framing a constitution, than are ordinarily used in the enactment of a statute, but when, in relation to the same general subject, the same or equivalent words are used, both in a constitution and in a statute, there is nothing, either in reason or in the authorities, requiring a different construction to be given to such words when found in the constitution, from that which ought to be given to them when used in the statute.

In construing constitutions, as well as statutes, the general maxim is " that the words used are to be interpreted, and explained, conformable to the general usage." Smith Constitutional Construction, 629, sec. 481.

"There is a striking analogy, and generally an entire harmony, between the rules of interpretation of constitutions and those of statutes." Potter's Dwarris on Statutes & Constitutions, 654. Sedgwick on Statutory & Constitutional Law, 2d ed., p. 404.

Construed in the light of the authorities referred to as above, and conformably to the general usage prevailing in the construction of phrases relating to popular elections, I am of the opinion that sections 1 and 2 of article 16 of the constitution may, for the purposes of this case, be epitomized and paraphrased so as to read substantially as follows :

When a proposed amendment to the constitution shall have been agreed to by two consecutive General Assemblies, it shall be submitted to the electors of the State, and if a majority of such electors, *voting at the election*, shall ratify the same, such proposed amendment shall become a part

of the constitution ; and if two or more amendments shall be submitted at the same time, they shall be submitted in such a manner that the electors shall vote for or against each of such amendments separately.

If I am right in this construction of these sections,—a construction almost uniformly given to similar provisions in statutes,—then the distinction insisted upon by the court, between a plurality merely and a majority of the electors of the State, has no practical importance in its application to the case at bar.

If section 1 had provided that a proposed amendment might have been agreed to by a majority merely of the General Assembly upon each separate vote upon it, no well informed parliamentarian would contend that a majority of a quorum, where only a mere quorum was found voting, might not agree to such amendment. · It is a well settled rule of parliamentary law, that a majority of a quorum, when a bare quorum is present, wields the power of the whole body, and is sufficient to pass a bill or to do any other legislative act. But it is provided that a majority of all the members elected to both houses, and to both General Assemblies, shall agree to a proposed constitutional amendment, before it shall be submitted to a popular vote, thus requiring a greater majority in its favor than would have been otherwise necessary. If, therefore, it was the intention of the framers of the constitution to place greater restrictions upon the electors of the State than are imposed in ordinary elections, as insisted upon by the court, why did they not say, in equally plain words to the effect. that " if a majority of said electors, *entitled to vote at the election,* shall ratify the same," such amendment should become a part of the constitution ? The necessity of being explicit in one case was as great as in the other ; and, if it was the intention to place additional and unusual restrictions both upon the General Assembly and upon the

people, why not use suitable and express words to that end in both cases?

Then, again, nothing is said or provided as to any negative vote when the General Assembly is required to vote in agreeing to a proposed amendment. It was obviously unnecessary that any thing should have been so said or provided, as a majority of all must assent, before the amendment is agreed to. Why then provide for the casting and counting of a negative vote, when the electors vote, if a majority of all entitled to vote are required to assent affirmatively, before the amendment is lawfully ratified?

These omissions and differences constitute circumstances which to my mind palpably tend to sustain the construction I am insisting upon in this case.

If the amendment under discussion had been submitted to the electors of the State at, and as a part of, a general election, and if the returns of that general election had shown affirmatively that a majority of those voting at such election had not voted to ratify such amendment, then quite a different question would have been presented for our consideration. There is good authority for holding that in such an event the amendment would not have been ratified. *The People* v. *Garner*, 47 Ill. 246 ; *The People* v. *Wiant*, 48 Ill. 263.

But no such element enters into this case. The amendment in question was submitted at what was, as to it, a special election. True, it was submitted on the first Monday in April, the day of our township elections, and the machinery, so to speak, of those elections, was used in obtaining a vote upon it. But a separate ballot was required and used in voting both for and against it, and separate and distinct returns were required and made as to the vote upon it to the Secretary of State.

Township elections are local and not general in their

character, and returns from them are only made to the clerks of the respective counties, and are not made a part of the archives of the State, as the returns of the general elections are. We are therefore unable to take judicial notice of the aggregate number of votes cast at those township elections on the day the amendments were voted upon. That is a subject about which we judicially know nothing, and concerning which we can presume nothing, adverse to the amendment under consideration. In my judgment, all the presumptions are to be taken in favor of the legality of every election held under the forms of law, and none against any such election. Every thing alleged against an election so held must be affirmatively shown. This is the essential point of difference between me and. my brethren who speak for the court. McCrary's Law of Elections, sec. 87.

Granting that we are required, in proper cases, to take judicial notice of each census of the State, and of the number of persons voting at each of our general elections, we are still unable to estimate from these, with even proximate certainty, the number of persons in the State entitled to vote on the first Monday of last April. It is an admitted fact, that the number of the voters of the State changes day by day, and is never the same for any perceptible length of time. It is, also, a matter of common observation that an entirely full vote is never polled, the number not voting at every election being always a variable and uncertain quantity.

The " electors of the State " are, in every sense, an *indefinite body*, within the meaning of Dillon on Municipal Corporations, *supra*, as contradistinguished from legislative bodies, corporations, associations and committees composed of a definite number of persons, and where the presence of a quorum is necessary to transact business.

The result of an election is a matter of exact calculation

and not of proximate estimates. One vote superadded in a proper case will turn the scale and constitute a majority. Hence, if we set up our judicial knowledge as to the number of electors in the State in opposition to the count taken from the ballot-box, that judicial knowledge ought to be mathematically accurate as to the number of such electors. Any judicial information less accurate than that, used to overthrow an election, might lead to chaotic confusion and to the most dangerous usurpations. We can never properly be required to act upon judicial information which, from its very nature, is *indefinite* and *uncertain*.

The proposition that a court may, upon its own information, go outside of the certified result of an election at which all had a chance to vote, and at which all voted who felt interest enough to vote, and enter upon a merely conjectural inquiry as to how many persons there may have been who might have voted, but "did not," with a view to testing the validity of such an election, impresses me as a most novel and extraordinary proposition indeed.

Such a proceeding is evidently not contemplated by any express provision of our constitution, and is utterly at variance with all of our long-established theorie as to the power and conclusiveness of the ballot.

I can not agree that the act of March 10th, 187, submitting the amendments to the electors of the State, was defective in not providing for a count of the aggregate number of votes cast at all the elections throughout the State on the same day the amendments were voted upon. No such provision is required by the constitution. No such provision is contained in the precedent legislation of this State; and no such provision is found in any of the analogous statutes of other States, to which my attention has been directed. I find nothing anywhere to sustain the court in holding that such a provision was necessary to the validity of the act in question.

The State *v.* Swift.

In respect to such a provision, the act of March 10th, 1879, stands on the same footing with the act of January 28th, 1873, submitting the Wabash and Erie Canal amendment. The latter act required no other count of the votes cast, than was furnished by the returns of the numbers voting for and against the amendment. The aggregate of the votes cast on that amendment was accepted as the whole number of the electors of the State for that occasion, and the majority of the votes so cast was held sufficient to ratify the amendment thus submitted.

The conclusions reached as to the ratification of that amendment have been acquiesced in for more than seven years. The court admit that that amendment can not now be disturbed. In that I fully concur, but for a different reason than that assigned by the court, and that is, because a majority of votes, at a fair election, were cast in favor of it. The legislation and subsequent proceedings on that amendment furnish what seems to me to be a practical and substantial precedent for the legislation and other proceedings which have been had on the amendment before us.

If the first named amendment was legally ratified, I am wholly unable to see any good reason for saying that the latter has not also been.

The difference between the Governor's proclamations in the two cases strikes me as quite immaterial. It is the vote of the electors which ratifies an amendment, and not the proclamation of the Governor. The constitution does not require any action of the Governor, in the ratification of an amendment. The proclamations of the Governor were issued in both cases in obedience to a statute and not to the constitution, and only afforded evidence in each case as to what the electors had done. The Governor's proclamation, however strongly worded, can give no validity to an amendment which has not been

legally ratified by the electors of the State. It is from the electors alone that the vitalizing power must come. All else is merely superadded for convenience in ascertaining what their action has been.

The act of March 10th, 1879, afforded every elector of the State an opportunity of voting separately for or against each one of the proposed amendments. The returns show that upon the particular amendment in controversy, there was an aggregate of 321,734 votes cast. Of that number there was a majority of 17,232 votes in favor of its ratification. Beyond these returns we have no right to go in estimating the number of the electors of the State, with reference to that vote. Beyond these returns it was not obligatory upon the Legislature to require us to go.

For the reasons given, I am irresistibly led to the conclusion that the amendment before us has been lawfully ratified by the electors of the State.

## DISSENTING OPINION.

SCOTT, J.—I am unable to concur in the opinion of the majority of the court in this case. I am of the opinion, that the constitution itself provides the method of submittting proposed amendments to the electors of the State for their ratification. That method is, that the proposed amendment or amendments shall be submitted in such manner that the electors shall vote for or against each of such proposed amendments separately. I am unable to see why the framers of the constitution made provisions for voting for or against the proposed amendments, if they meant and intended that no amendment should become a part of the constitution, unless ratified by the votes of a majority of all the electors of the State, on the day on which such proposed amendments should be submitted. Such a construction and interpretation would, in my opinion, lead to interminable trouble and confusion.

I am of opinion, that the proper interpretation of sections 1 and 2 of article 16 of the 'constitution is, that when an amendment of the constitution is properly passed by the General Assembly and submitted to the electors of the State, if it be ratified by a majority of the electors voting for and against such amendment, it becomes a part of the constitution. Whether such proposed amendment received the requisite number of votes to make it a part of the constitution, must be determined in the manner prescribed by the legislative department of the State government. The manner of determining this question, as to the amendment involved in this case, was fixed by the act of March 10th, 1879, Acts 1879, p. 29. That act submitted the amendment, together with others, in accordance with the method prescribed by section 2 of article 16 of the constitution, and was fully complied with; and when the Governor, in compliance with said act, issued his proclamation declaring that the amendment had received, for its ratification, 169,479 votes, and against its ratification, 152,363 votes, that was an end of the question, and this court can not, in my opinion, go behind this political act of a co-ordinate branch of the State government, and hunt for information upon which to base a judgment. It is objected that there was nothing in the act of March 10th, 1879, authorizing the Governor to declare the amendment as having been ratified, and a part of the constitution; and that, therefore, the act was incomplete. It is conceded, that if the act had, in express terms, authorized the Governor to issue his proclamation, declaring the amendment ratified, and he had done so, that act would have been conclusive. I am unable to see any force in this position. When the Governor had issued his proclamation, giving the number of votes for and against the amendment, that was all he was required to do, and the constitution itself fixed the

conclusion, that such amendment had become a part of that instrument.

The opinion of the majority of the court proceeds on the theory that, if the amendment had been submitted on a day when there was no general election, the number of votes cast for and against such amendment would constitute the number of electors of the State; and, if it had received a majority of the votes thus cast, it would have been ratified in accordance with section 1 of article 16 of the constitution. I am unable to see any force in this distinction, when applied to the case under consideration. Under the act of March 10th, 1879, the submission of the amendments proposed by the General Assembly, was as distinct a proposition as if they had been submitted on some other day. The ballots were distinct; the vote on each amendment was separate and distinct; there was a separate and distinct certification of the vote for and against each amendment, by the officers of the election, to the clerks of the several counties; by the clerks to the Secretary of State; by the Secretary of State to the Governor; and the Governor was to declare the result, by proclaiming the number of votes for and against each of the amendments, which was done in accordance with the act.

The following language is used in the opinion of the court:

"As the amendment was submitted upon the day of the general spring elections throughout the State, and as there were, by law, officers to elect at the same time in the various counties, it must be presumed that other votes than those for or against the amendment were cast at the same time."

If it be meant by this, that it is fair to presume that the electors, at the spring election, voted for township officers, in addition to voting upon the question of the proposed

amendment, I assent to the presumption; but if it be meant that it must be presumed that more electors voted for township officers than for and against the amendment, or that any elector voted for township officers, who did not vote on the question of ratifying the amendment, then I totally dissent; for no such presumption can arise, either as a rule of law or as a consequence.

Again it is said by the court:

"From the peculiar ballots used in voting upon the amendment, many electors may have voted ' no ' and ' yes,' which votes upon the question of the amendment would not be counted; such, also, should be counted in estimating the whole number of the electors voting."

I am wholly unable to see how any such assumption, as is contained in this proposition, can be used for the purpose of forming a judgment; for it must be assumed, I think, that the electors exercised the right of voting for or against the proposed amendment in the manner prescribed by the constitution and the law. True, they may have voted a double ballot, by mistake or inadvertence, but there is no such presumption in law.

It is said by the court:

" There is no source from which this court can ascertain whether the amendment received a majority of all the votes cast at the election or not."

If there were any votes cast at that election other than those cast for and against the amendment, I am unable to ascertain the fact from any source of information of which this court may or can properly take judicial notice.

Under the act of March 10th, 1879, submitting the amendment under consideration to the electors of the State for their ratification, all had the right of voting for or against said proposed amendment Whether all did vote or not, I am unable to say from any source of information of which this court can take judicial notice; nor do

I think it essential that all should vote.  I think the true rule is, that all qualified voters or .electors, who absent themselves from an election duly called, or who fail to vote on a proposition legally and fairly submitted to them, are .presumed to assent to the expressed will of the majority of those voting, unless the law providing for the election otherwise declares.    Any other rule would be productive of greatest inconvenience, and ought not to be adopted, unless the legislative will to that effect be clearly expressed.   *County of Cass* v.  *Johnston*, 5 Otto, 360; *Louisville, etc., R. R. Co.* v.  *County Court*, 1 Sneed, 637 ; *The People* v.  *Warfield*, 20 Ill. 159 ; *The People* v.  *Garner*, 47 Ill. 246 ; *The People* v.  *Wiant*, 48 Ill. 263.

The court say :

" The first amendment proposed and ratified under this article of the constitution was section 7 in article 10, in reference to the Wabash and Erie Canal.   By the act of the General Assembly of January 28th, 1873, Acts 1873, p. 83, the Governor and Secretary of State were required to examine the election returns and declare the result of the election ; ' and if it shall appear from said examination that a majority of all the votes cast at said election were in favor of the adoption of said proposed amendment, then, and thereupon, the said amendment shall be and become a part and parcel of the constitution of the State of Indiana, and the Governor of this State shall, as soon as practicable, issue his proclamation, embodying the said amendment therein, and declaring and proclaiming that the same has been duly ratified by the people, and is therefore a part of the constitution of the State.'

" In pursuance of this act, the Governor and Secretary of State declared the returns of the election, and the Governor issued his· proclamation, declaring that the proposed amendment had received the requisite constitutional majority in its favor, necessary to its ratification, and had

become a part of the constitution of the State, as section 7 of article 10 thereof, which section is now printed by authority in the constitution. The matter, therefore, having been decided and proclaimed, according to law, by the executive department, a .co-ordinate branch of the government, has now become *res adjudicata.*"

While I agree to the conclusion announced in this portion of the opinion, I am wholly unable to see what relation it bears to the question in this case. The question of the validity of section 7 of article 10 of the constitution was certainly not before the court for its judgment. If it be true, that the constitution requires a majority of all the electors of the State to vote affirmatively in favor of a proposed amendment, to make it a part of the constitution, then the doctrine announced in this portion of the opinion of the majority of the court would permit the legislative and executive departments of the State government to violate the constitution by pronouncing an amendment to have passed, when in point of fact it had not, and make this act of usurpation binding on the people of the State. The constitution does not require the Governor to issue any proclamation, in order to give validity to a constitutional amendment. The majority of the electors is the vitalizing force, and, if a majority vote in favor of a proposed constitutional amendment, it becomes a part of the constitution, without any proclamation of the Governor; for the constitution says: "If a majority of said electors shall ratify the same, such amendment or amendments shall become a part of this constitution."

Courts take judicial knowledge of the proclamation of the Governor of the State, and the facts therein stated are taken as true; but I cannot assent to the proposition, that a proposed amendment may become a part of the constitution, because it may be so decided and proclaimed by the executive department of the government.

The amendment now published as section 7 of article 10 of the constitution, like the amendment under consideration in this case, became a part of the constitution, in my opinion, the moment the last ballot was cast, and all that was afterwards done in relation to the election, such as the aggregation, compilation and certification of the vote by the several officers, and the proclamation of the Governor, was done in compliance with the methods adopted by the General Assembly, for the purpose of ascertaining an already accomplished fact.

The amendment became a part of the constitution by reason of its having been ratified by a majority of votes cast for and against it, and not by reason of the Governor's proclamation, which was and still is the evidence of its ratification by a majority of the electors of the State.