THE STATE, CHARLES BOTT ET AL., PROSECUTORS, v. GEORGE WURTS, SECRETARY OF STATE.

This was an application made by Charles Bott and others for a writ of *certiorari* to review the statement of the result of an election held in the State of New Jersey, on the 28th day of September, 1897, for the proposed amendment to the constitution of the state relating to lotteries and gambling, as ascertained and determined by the board of state canvassers organized under the act of the 25th of May, 1897, on the 19th day of October, 1897, whereby the said board determined and declared that at said election the proposed amendment to the constitution, relating to lotteries and gambling, which reads as follows:

"Amend paragraph 2, of section VII., of article IV., so as to read as follows:

" 2. No lottery shall be authorized by the legislature or otherwise in this state, and no ticket in any lottery shall be bought or sold within this state, nor shall pool-selling, book-making or gambling of any kind be authorized or allowed within this state, nor shall any gambling device, practice or game of chance now prohibited by law be legalized, or the remedy, penalty or punishment now provided therefor be in any way diminished," was adopted.

The application was made at the November Term, 1897, before Justices VAN SYCKEL, DIXON and COLLINS.

For the applicant, *Allan L. McDermott, William D. Edwards* and *John P. Stockton.*

*Contra, Samuel H. Grey,* attorney-general.

Justices DIXON and COLLINS concurred in allowing the writ.

VAN SYCKEL, J., dissented.

VAN SYCKEL, J. (dissenting).    Our state constitution authorizes the legislature to formulate amendments to the constitution and submit them to a vote of the people for ratification or rejection at a special election to be held for that purpose, and it provides that "if the people shall approve and ratify such amendment or amendments, or any of them, by a majority of the electors qualified to vote for members of the legislature voting thereon, such amendment or amendments so approved and ratified shall become part of the constitution."

No provision is contained in the constitution for the manner of finally determining whether an amendment has received a majority vote.

The legislature, by an act passed May 25th, 1897, submitted to the popular vote, among other amendments, an amendment relating to "lotteries and gambling."

This act provides for the conducting of the election, and in its tenth section directs that the respective boards of registry and election shall count and canvass the ballots given relative to each of the said proposed amendments, and thereupon shall set down in writing the whole number of votes given for each of said proposed amendments and the whole number of votes given against each of the said proposed amendments, and certify and subscribe the same and deliver their statement so certified to the county clerk.

The eleventh section of the act makes it the duty of the county boards of election to examine these statements, and make and certify duplicate statements of the result of the election as shown thereby, one copy of which is to be delivered to the county clerk, and the other transmitted to the secretary of state, to be filed in his office as an official paper.

Section 12 provides that it shall be the duty of the governor to summon four or more of the members of the state senate, who shall meet at the time and place in said act specified, and they, with the governor, shall constitute a board of state canvassers to canvass and estimate the votes given for and against each of said amendments, and the said board shall determine

and declare which of said proposed amendments have been adopted, and shall forthwith deliver a statement of the result as to each amendment, to the secretary of state, and any proposed amendment, which, by said certificate and determination of the said board of state canvassers, shall appear to have received in its favor a majority of all the votes cast in the state for and against said proposed amendment, shall, from the time of filing such certificate, be and become an amendment to and part of the constitution of this state, and it shall be the duty of the governor forthwith to issue a proclamation declaring which of the proposed amendments have been adopted by the people.

From this recital it will be perceived that the legislature constituted the governor of the state, and the senators summoned by him, a tribunal to determine and conclusively settle whether an amendment had been adopted.

That tribunal, without dissent on the part of any of its members, declared that the amendment hereinbefore mentioned had been duly adopted, and the governor thereupon issued his proclamation as the act required.

Application is now made to this court for a writ of *certiorari* to review the decision of the state board, by Charles Bott, whose only interest in the question is that of a taxpayer and a legal voter in this state.

This involves the inquiry whether this court has the power to entertain such an application.

The question is not a novel one. So far as my investigation has extended, in the limited time at my command to devote to this subject, the authorities uniformly hold that the courts have no power to review the decision of the tribunal selected by the legislature for this purpose.

In Dorr's case, the defendant offered to set up in his defence that a constitution had been adopted by a majority vote of the people, and that he did the acts charged against him under that constitution. Chief Justice Durfee said "that courts and juries do not count votes to determine whether a constitution has been adopted or a governor elected or not.

Courts take notice, without proof offered from the bar, what the constitution is or was, and who is or was the governor of the state.   It belongs to the legislature to exercise this high duty.   It is the legislature which, in the exercise of its delegated sovereignty, counts the votes and declares whether a constitution be adopted or a governor elected or not, and we cannot revise or reverse their acts in this particular, without usurping their power."   2 *Whart. Cr. L. (5th ed.)*, § 2777.

The same question was considered in the case of Luther *v.* Borden, in the United States Supreme Court, reported in 7 *How.* 1.   Chief Justice Taney, in an exhaustive discussion of the subject, says :

" Certainly the question which the plaintiff proposed to raise, by the testimony offered, has not heretofore been recognized as a judicial one in any of the state courts.   In forming the constitutions of the different states, after the declaration of independence, and in the various changes and alterations which have since been made, the political department has always determined whether the proposed constitution or amendment was ratified or not by the people of the state, and the judicial power has followed its decision.   In Rhode Island the question has been directly decided.   Prosecutions were there instituted against some of the persons who had been active in the forcible opposition to the old government. And in more than one of the cases evidence was offered on the part of the defence similar to the testimony offered in the Circuit Court and for the same purpose—that is, for the purpose of showing that the proposed constitution had been adopted by the people of Rhode Island, and had therefore become the established government, and consequently that the parties accused were doing nothing more than their duty in endeavoring to support it.   But the courts uniformly held that the inquiry proposed to be made belonged to the political power, and not to the judicial ; that it rested with the political power to decide whether the charter government had been displaced or not ; and when that decision was made, the judicial department would be bound to take notice of it as

the paramount law of the state, without the aid of oral evidence or the examination of witnesses; that according to the laws and institutions of Rhode Island, no such change had been recognized by the political power. * * * Indeed, we do not see how the question could be tried and judicially decided in a state court. * * * And if a state court should enter upon the inquiry proposed in this case, and should come to the conclusion that the government under which it acted had been put aside and displaced by an opposing government, it would cease to be a court, and be incapable of pronouncing a judicial decision upon the question it undertook to try. If it decides at all as a court, it necessarily affirms the existence and authority of the government under which it is exercising judicial power."

The force, in its application to the case before us, of these observations of Chief Justice Taney with respect to the inability of courts to decide such questions will be apparent if we suppose that our legislature had submitted to the popular vote what were termed the "Court amendments," and that such amendments had received the precise vote given to the "Anti-gambling amendment."

After the courts had been reconstructed in pursuance of the amendment, neither the courts at present existing nor the courts as remodeled could pass upon such a controversy as that now sought to be instituted.

Mr. Justice Woodbury, in Luther *v.* Borden, concurred in the views of Chief Justice Taney hereinbefore recited, and I think it will be wise for courts and judges to bear in mind the language in which he expressed himself. He says, after stating that he regards this as a merely political and not a judicial question, that "Another evil, alarming and little foreseen, involved in regarding these as questions for the final arbitrament of judges, would be that in such an event all political privileges and rights would, in a dispute among the people, depend on our decision finally. We would possess the power to decide against as well as for them, and under a prejudiced and arbitrary judiciary the public liberties and popular privileges might thus be much perverted, if not entirely prostrated.

But allowing the people to make constitutions and unmake them, allowing their representatives to make laws and unmake them, and without our interference as to their principles or policy in doing it, yet when constitutions and laws are made and put in force by others, then the courts, as empowered by the state or the union, commence their functions and may decide on the rights which conflicting parties can legally set up under them, rather than about their formation itself. Our power begins after theirs ends. Constitutions and laws precede the judiciary, and we act only under and after them, and as to disputed rights beneath them, rather than disputed points in making them. We speak what is the law, *jus dicere*, we speak or construe what is the constitution, after both are made, but we make or revise or control neither. * * * But the other disputed points in making constitutions, depending often, as before shown, on policy, inclination, popular resolves and popular will, and arising not in respect to private rights, * * * but in relation to politics, they belong to politics and they are settled by political tribunals, and are too dear to a people bred in the school of Sidney and Russell for them ever to intrust their final decision, when disputed, to a class of men who are so far removed from them as the judiciary; a class also who might decide them erroneously as well as right."

The question is asked, what remedy will the citizens have if the tribunal created by the legislature, either intentionally or by mistake, declare a result which is erroneous? The obvious answer is that the decision of the tribunal which the people in the exercise of their sovereign right to amend the constitution have made the final arbiter can no more be questioned or reviewed than can the judgment of our highest court in a matter within its jurisdiction. Nor can we suppose that such a tribunal will be more likely than our courts to commit an error. Courts have no more right to distrust the political branch of the government than that department has to distrust the courts.

Legal principles cannot safely be discussed and settled upon such assumptions.

This inquiry was answered by Mr. Justice Woodbury on page 55 in the case above cited as follows :

"If it be asked what redress have the people, if wronged in these matters, unless by resorting to the judiciary, the answer is, they have the same as in all other political matters. In those they go to the ballot-boxes, to the legislature or executive for the redress of such grievances as are within the jurisdiction of each, and for such as are not, to conventions and amendments of constitutions."

In the case of *State* v. *Swift,* 69 *Ind.* 512, much relied upon by the prosecutor, Chief Justice Biddle delivered the opinion of the Indiana Supreme Court. He referred to an amendment to the state constitution, known as section 7 in article 10 of the constitution, which had been submitted to the vote of the people some years before the submission of the amendment which was the subject of controversy in the case before him. The act of the legislature, under which that earlier amendment had been adopted, provided that the governor and secretary of state should examine the election returns and declare the result of the election, and if it should appear from said examination that a majority of all the votes cast at said election were in favor of the adoption of such amendment, then the amendment should be and become part of the constitution, and the governor should issue his proclamation so declaring.

Chief Justice Biddle says that " the governor and secretary of state canvassed the returns, and the governor issued his proclamation declaring that the said amendment had become part of the constitution. The matter therefore having been decided and proclaimed according to law by the executive department, a co-ordinate branch of the government, has now become *res adjudicata.*"

He could not have pronounced it "*res adjudicata*" unless he regarded it as the decision of a tribunal which was not subject to review by the courts.

His decision in the principal case was put expressly upon the ground that the legislature had provided, in the act sub-

mitting the amendment to popular vote, no way of adjudicating what the result of the vote was.

If we accept these views of eminent jurists, this court is without power to entertain the application now made. In my judgment, both upon authority and principle, it must be held that there is an entire absence of jurisdiction in the courts. The right to alter and amend constitutions inheres in the sovereignty of the people, and it is unhampered except in so far as it is regulated by existing provisions of the fundamental law. No provision being made in the constitution for determining how the result of the popular vote shall be settled, the people, in the exercise of their reserved sovereign power, had the right through their representatives in the legislature to declare how a decision shall be made final and conclusive.

Unless this right in the people is conceded, no way can be logically found to call a constitutional convention, as no reference is made in our constitution, as now framed, to such a convention.

But if the jurisdiction of the court could be admitted, how stands this case?

This court, in the very recent application of Bott for a *mandamus* to require a recount of the popular vote, made its deliverance in the following language:

" The election at which the amendment was submitted did not affect any individual or private right. It concerned the government alone. Public policy, therefore, is to be primarily regarded in an application to recount the vote. The legislature, by the act under which this amendment was submitted to the popular vote, having declared how that vote should be canvassed, made it the duty of the governor, after determining that the amendment had received a majority vote, to issue a proclamation forthwith, declaring that it had been adopted by the people. This was a declaration by the legislature that so far as the government was concerned public policy required that the question should be at rest when the chief executive had performed the duty imposed upon him by the statute; that verification of the correctness of the result satisfied the

state, and it should be held to satisfy the relators. By the mandate of the legislature the amendment has become incorporated in the constitution of the state."

There was the further reason given for refusing the recount, that it would be attended with great uncertainty and give much opportunity for fraud, but that in nowise affects the pertinency of the language above quoted to this controversy.

The conditions have not changed; the public policy is still the same. The prosecutor has acquired no new rights; he still has no private right to be protected by the writ he asks for. The government is still satisfied, and was represented by the attorney-general of the state, who earnestly resisted this application before us. This amendment, which we declared had become imbedded and incorporated in our constitution, must be still there. Whence, therefore, does Bott derive any right to ask this court to mutilate our organic law?

By what process this court will take out of the constitution an amendment it has so recently declared to be part and parcel of it is a mystery that I am unable to solve. The agitation of this subject should, in my judgment, end here.

That this court, in the exercise of its discretionary power, may refuse to grant a writ of *certiorari* cannot be disputed. *Wilkinson* v. *Trenton*, 7 *Vroom* 499; *State* v. *Commissioners*, 1 *Id.* 247; *Hampson* v. *Paterson*, 7 *Id.* 149; *Ropes* v. *Road Board*, 8 *Id.* 335; *Jersey City* v. *Traphagen*, 24 *Id.* 434. These cases hold that where a prosecutor has no private right to be affected, or where public policy forbids, he will not be allowed to institute the controversy. The test is not whether he could submit a debatable question if the writ is issued; he will not be afforded the opportunity to do so, when it contravenes public policy, as we have declared it will in this case.

If any reason could exist to justify the court in disregarding its recent utterances, it does not appear in this case.

There is nothing legally before us to show any merit in this case on the part of the prosecutor.

The contention is that it appears that the amendment received seventy thousand four hundred and forty-three votes

for, and sixty-nine thousand six hundred and forty-two votes against it, and that nine hundred and sixty-one ballots were rejected, and that if the rejected votes are added to the votes for the amendment and the votes against the amendment, the vote given for the amendment is not a majority of the whole vote cast at the election.

*First.* The constitution provides who shall be qualified to vote, but does not prescribe what shall be a vote. It is, therefore, the province of the legislature to say what shall constitute a vote, the same rule being applied to all electors. The legislature has prescribed in the Werts law how votes shall be cast to be regarded in the law as votes in a legal sense. We must presume that the board of registry and election acted rightly in rejecting the nine hundred and sixty-one ballots, and that the persons who cast them did not exercise their right in such a way as to entitle them to be counted as qualified electors voting on the amendment.

The constitution provides that where more than one amendment is submitted, as was the case in this instance, they shall be submitted in such manner and form that the people may vote for or against each amendment separately and distinctly. The only votes, therefore, which, within the purview of the constitution, can be regarded in deciding the question of majority are votes for and votes against the amendment. The legislative act, in its twelfth section, expressly declares that the amendment shall be part of the constitution if it receives a majority of all the votes cast for and against it. The governor and the senators who constituted the legislative tribunal properly decided that question.

*Second.* It does appear on the statement made up by the board of state canvassers, certified under the hand of the governor and attested by the secretary of state, that nine hundred and sixty-one ballots were rejected, but this statement, as it appears to me, had no basis except the certificate of the result of the election made by the respective boards of registry and election and delivered to the several county clerks, in pursuance of the tenth section of the act of May 25th, 1897.

That section authorizes the election officers to set down and transmit to the county clerk only the number of votes given for and the number given against the amendment, and is legal evidence for no other purpose. It has no evidential value whatever for the purpose of showing how many votes were rejected. It appears, therefore, that all we have legally before us is that seventy thousand four hundred and forty-three votes were given for this amendment and sixty-nine thousand six hundred and forty-two votes against it.

The fact that sixty-nine thousand six hundred and forty-two electors voted against the adoption of this amendment cannot give this court jurisdiction in this case, or be any better reason for granting a writ of *certiorari* than it is for granting a writ of *mandamus* for a recount of the votes.

These, with all other electors in the state, agreed through their representatives in the legislature, in two successive years, that the result of the vote should be conclusively settled on their behalf by the tribunal provided in the legislative act. That tribunal was the instrument chosen by the people, speaking through their representatives, to determine the result. It was a consent on the part of all these sixty-nine thousand six hundred and forty-two electors, as well as all others in the state, to submit this question to the final arbitrament of that tribunal, presided over by the governor, whose judgment is entitled to the highest confidence and respect. The deliverance of that body was an irrevocable declaration by the people, acting through the political department of the government upon a political question, that the amendment had been adopted by them.

The courts have no more right to challenge or controvert that decision than they have to call in question the regularity of the proceedings of the legislature in passing a statute.

It is the conceded law of this state that such power does not reside in the judiciary. *Pangborn* v. *Young*, 3 *Vroom* 29.

In the language of Chief Justice Taney and Mr. Justice Woodbury, the people, through the political department of the government, decide whether a law has been passed or a

constitutional amendment adopted, and the judiciary must accept that decision.

The power of the judiciary begins where that of the political department ends, and relates exclusively to the interpretation of constitutions and laws.

The harmonious working of our complex system of government cannot be preserved unless each department is scrupulously careful to act within the true limits of its domain.

For these reasons I feel constrained to differ with my associates, and refuse to assent to the granting of the writ applied for.

The prosecutor has admittedly no private right to be protected by the writ. All he can accomplish by the successful prosecution of it would be to give the legislature the power to declare that to be lawful which is now a crime.