CHARLES BOTT ET AL. v. THE SECRETARY OF STATE.

Argued February 21, 1898—Decided June 13, 1898.

1. In every government organized under a constitutional form of government, the initial steps for a change in the constitution are with the legislative department, which alone is authorized to speak for the people upon this subject, and to point out a mode for the expression of their will in the absence of any provision for amendment or revision contained in the constitution.

2. Article 9 of the constitution of 1844 provides as follows: "Any specific amendment or amendments to the constitution may be proposed in the senate or general assembly, and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments shall be * * * referred to the legislature then next to be chosen; * * * and if in the legislature next chosen as aforesaid such proposed amendment or amendments, or any of them, shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the legislature to submit such proposed amendment or amendments, or such of. them as may have been agreed to as aforesaid by the two legislatures, to the people, in such manner and at such time * * * as the legislature shall prescribe; and if the people, at a special election to be held for that purpose only, shall approve and ratify such amendment or amendments, or any of them, by a majority of the electors qualified to vote for members of the legislature voting thereon, such amendment or amendments so approved and ratified shall become part of the constitution; provided, that if more than one amendment be submitted, they shall be submitted in such manner and form that the people may vote for or against each amendment separately and distinctly." In pursuance of an act passed May 25th, 1897 (*Pamph. L.*, *p.* 461), three separate amendments, of which the amendment in question was one, were submitted to the people at a special election held on the 28th of

September, 1897. *Held*, that the two legislatures of 1896 and 1897 having agreed to the said amendments in all respects in compliance with the constitution, the jurisdiction of the legislature of 1897 to provide for the submission of these amendments to the people was complete.

3. The act of the legislature submitting to a popular vote three separate amendments provided for a ballot in the following form, viz.: "For all propositions on this ballot which are not canceled with ink or pencil and against all which are so canceled. For the proposed amendment to the constitution relating to lotteries and gambling, which reads as follows" (setting the same out at large). "For the proposed amendment to the constitution relating to appointment to office, which reads as follows" (setting it out in full). "For the proposed amendment to the constitution relating to woman suffrage, which reads as follows" (setting it out in full). The act provided, also, that each ballot should be counted as a vote for each proposition thereon not canceled with ink or pencil and against each proposition so canceled, and that return thereof should be made by the boards of election. *Held*, that such ballot complied with the constitutional prescription which required such amendments to be submitted "in such manner and form that the people may vote for or against each amendment separately and distinctly," and that it was not competent for the judiciary to set aside the result of an election certified and approved as prescribed by the act, on the assumption that some other form of voting would be preferable or even fairer.

4. The constitutional provision prescribing the manner for the submission of the amendments to the people provided that if the people should approve and ratify such amendment or amendments, or any of them, by a majority of the electors qualified to vote for members of the legislature voting thereon, such amendment or amendments, so approved and ratified, should become part of the constitution. *Held*—
1. That it was not necessary that a proposed amendment should receive the votes of a majority of all the qualified electors of the state or of those whose names appeared on the poll-books as voting at such election; that the result of such an election was determined by the number of votes cast for and against the proposed amendment, and not by the majority of the electors qualified to vote or of the persons voting at such election.
2. That when the constitution provided for submitting amendments to the people at an election, it was contemplated that the submission was to be at an election held in conformity with the regulations adopted in the act submitting the amendments or by the general laws of the state, and by electors qualified to vote and voting thereon, was meant qualified voters who exercised the elective franchise in such a manner as to entitle their ballots to be canvassed and counted in ascertaining the result of the election.

5. The act of the legislature provided for the manner in which the election should be held and the result ascertained, declared and certified— that the election officers of the several election precincts should certify the result to the county board of election; that the county board of election should make up a statement of the result in the county; that such statements should be filed in the office of the secretary of state; that a board of state canvassers should be convened, which should make and certify a statement of the result of the election in the state; that the several county boards of election should make their statements from the results certified by the election officers, and that the board of state canvassers should make its statement from the statements certified by the county boards of election. The act further provided that any proposed amendment which, by said certificate and determination of the board of state canvassers, shall appear to have received in its favor a majority of all the votes cast in the state for and against said proposed amendment, should, from the time of filing such certificate, be and become an amendment to and part of the constitution of this state. The board of state canvassers convened and proceeded in their canvass in the manner prescribed by the statute, and determined and declared which of said proposed amendments had been adopted, and delivered a statement of the result as to each proposed amendment to the secretary of state, to be filed in his office as an official paper. The certificate of the board of state canvassers certified that the number of votes given for the proposed amendment to the constitution relating to lotteries and gambling was seventy thousand four hundred and forty-three, and against that amendment, sixty-nine thousand six hundred and forty-two. By this statement it was also certified that the number of names on the poll-books was one hundred and forty-one thousand six hundred and seventy-two, and that the number of ballots rejected was nine hundred and sixty-one. If the ballots rejected were counted in ascertaining the result the amendment was lost. Rejecting these ballots, the majority in favor of the amendment was eight hundred and one. *Held*, that it must be presumed that the ballots so certified by the election officers as rejected were properly rejected, and consequently were to be excluded from the computation of the votes cast for and against the amendment. In canvassing the result of an election such ballots were simply nullities.

6. The legislature, in submitting the proposed amendments to the people, constituted the board of state canvassers, the tribunal by which the result of the election should be ascertained, and vested in it the jurisdiction to determine whether any amendment or amendments proposed had been adopted, and gave to the certificate of the board such force and effect that upon filing the same the amendment or amendments so certified to have been adopted should be and become part of the constitution of the state, and made it the duty of the governor to issue a proclamation declaring which of the proposed amendments had been

adopted by the people. *Held*, that the concurrence of the board of
state canvassers and the executive department of the government in
their respective official functions places the subject beyond the cog-
nizance of the judicial department of the government. After the
decision and determination of the board of state canvassers and the
proclamation of the governor, the matter has passed beyond the reach
of the judiciary.

On writ of *certiorari* to bring up the statement of the result
of an election held September 28th, 1897, for the adoption or
rejection of certain constitutional amendments. The writ was
sued out by prosecutors, who are citizens and taxpayers of
the State of New Jersey, who voted at the special election
held on September 28th, 1897, upon the constitutional amend-
ments. It was directed to the secretary of state, to bring up
the statement of the result of such election so far as concerned
the proposed amendment to the constitution relating to lot-
teries and gambling, as ascertained and determined by the
board of state canvassers, whereby said board determined and
declared that at said election the proposed amendment was
adopted.

The constitutional amendment in question, together with
two other proposed amendments, one of which related to
appointment to office and the other providing for woman suf-
frage, were submitted to the electors qualified to vote for
members of the legislature, in pursuance of an act passed
May 25th, 1897. *Pamph. L., p.* 461. The act is entitled
"An act to provide for submitting proposed amendments to
the constitution of this state to the people thereof." It re-
cited : "Whereas, certain proposed amendments to the con-
stitution of this state were, at the session of the legislature
held in the year one thousand eight hundred and ninety-six,
agreed to by a majority of the members elected to each of
the two houses thereof, and entered on the journals of each
of said houses with the yeas and nays taken thereon, and
referred to the legislature then next to be chosen ; and
whereas, the said proposed amendments were published as
required by the constitution ; and whereas, in the legisla-

ture then next chosen certain of those proposed amendments have been agreed to by a majority of all the members elected to each house; and whereas, the constitution of this state requires the legislature to submit such proposed amendments as have been agreed to as aforesaid to the people, at a special election to be held for that purpose," and enacted that on Tuesday, the 28th day of September then next, a special election should be held to enable the electors qualified to vote for members of the legislature to vote for or against each of the proposed amendments to the constitution. The second section provided that the district boards of registry and election in the several election districts should conduct the said special election, and that the same should be conducted, as far as practicable, in the manner now required by law for conducting the annual elections for members of the general assembly, except as otherwise directed in the act. The fifth section provided that all persons entitled to vote for members of the legislature at the time of said special election should be entitled to vote in their respective election districts or precincts, provided they had been registered as provided for in the act. The third section provided that at such election each voter registered as therein required might present a ballot in the form following: "For all propositions on this ballot which are not canceled with ink or pencil, and against all which are so canceled. For the proposed amendment to the constitution relating to lotteries and gambling, which reads as follows" (setting the same out at large as adopted by the legislature). "For the proposed amendment to the constitution relating to appointment to office, which reads as follows" (setting it out in full). "For the proposed amendment to the constitution providing for woman suffrage, which reads as follows" (setting it out in full). By section 17 it was made the duty of the secretary of state to prepare and have printed a sufficient number of ballots required by the act, in the form therein provided, for the use of the voters, and to transmit to the clerk of each county a sufficient num-

ber for the use of the voters therein, and also blank statements of the result of the election and copies of this act; and it was made the duty of the clerk of the county to transmit to the district boards of registry and election in each election district a sufficient number of such ballots and blank statements for the use of voters and the board of election in such district, on the back of which said ballots should be printed, "Special Election, September 28, 1897, Official Ballot," followed by a fac-simile of the signature of the secretary of state. This section also provided that no ballot should be used or counted in such election except such official ballots, with a provision with respect to the non-delivery of official ballots, &c., not material to this case. By section 18 voters were permitted to procure from the secretary of state official ballots before the election day.

Section 4 provided that each ballot should be counted as a vote for each proposition thereon not canceled with ink or pencil, and against each proposition so canceled, and return thereof should be made by the boards of election. Sections 6, 7 and 8 provided for registration, revision of the registry and the punishment of offences against the election laws of the state. Section 9 provided that no official envelope should be required or used at such election, and that the manner of voting and the procedure of the election officers should in all respects conform to the general law respecting elections. Section 10 provided that after closing the polls of such election the boards of registry and election should count and canvass the ballots given relative to each of the said proposed amendments to the constitution, and thereupon should set down in writing the whole number of votes given for each of the said amendments in the words in which the said proposed amendment was thereinbefore given and the whole number of votes given against each of the said proposed amendments as thereinbefore given, and should certify a statement of the result of the same and cause the same so certified to be delivered to the clerk of the county, who should file the same in his office as

an official paper. By section 11 the county boards of election were required to meet at a certain day, and the clerk of the county was required to produce before said board the certificates filed in his office in pursuance of section 10 of the act, and the said board was required to proceed thereon, to· examine the same and make and certify duplicate statements of the result of the election as shown thereby, and cause one of such statements to be delivered to the clerk of the county, to be filed, and should cause the other statement to be transmitted to the secretary of state, to be filed in his office as an official paper.

Section 12 is in these words : " It shall be the duty of the governor to summon to attend him, on the nineteenth day of October next, four or more of the members of the senate, who shall meet on said day of October, in the senate chamber, in the city of Trenton, at the hour of two o'clock P. M., and they, with the governor, shall constitute a board of state canvassers to canvass and estimate the votes given for and against each of said amendments, and the said board of state canvassers shall proceed to organize and determine the result according to the provisions of the act entitled 'An act to regulate elections,' approved April eighteen, eighteen hundred and seventy-six, so far as they are applicable, and it shall be the duty of the secretary of. state to produce and lay before such board all such statements and copies as relate to such election which he shall have received or obtained pursuant to this act or pursuant to the above-stated act to regulate elections ; the said board of state canvassers shall determine and declare which of said proposed amendments have been adopted, and shall forthwith deliver a statement of the result as to each amendment to the secretary of state of this state, to be filed in his office as an official paper, and any proposed amendment which by said certificate and determination of the board of state canvassers shall appear to have received in its favor a majority of all the votes cast in the state for and against said pro-

posed amendment, shall from the time of filing such certificate be and become an amendment to and part of the constitution of this state, and it shall be the duty of the governor of this state forthwith after such determination to issue a proclamation declaring which of said proposed amendments have been adopted by the people."

The ballots furnished by the secretary of state were in the form provided by the act, a specimen of which annexed to the case shows that on the face of the ballot each amendment was set out separately and distinctly, so that the persons voting at the election might vote for or against each amendment.

The certificate of the board of state canvassers attesting its proceedings is as follows:

"A statement by the board of state canvassers of the result of an election held in the State of New Jersey on the twenty-eighth day of September, in the year of our Lord one thousand eight hundred and ninety-seven, for *Proposed Amendments to the Constitution of this State,* as exhibited by the official returns from the several boards of county canvassers as filed in the office of the secretary of state:

" The number of votes given for and against each proposed amendment is as follows: For the proposed amendment to the constitution relating to lotteries and gambling, which reads as follows " (setting the same out in words at length), " 70,443.    Against the proposed amendment to the constitution relating to lotteries and gambling, which reads as follows" (setting the same out in words at length), " 69,642. For the proposed amendment to the constitution relating to appointment to office, which reads as follows " (setting the same out in words at length), " 73,722.    Against the proposed amendment to the constitution relating to appointment to office, which reads as follows " (setting the same out in words at length), " 66,296.    For the proposed amendment to the constitution providing for woman suffrage, which reads as follows " (setting the same out in words at length), " 65,021. Against the proposed amendment to the constitution providing for woman suffrage, which reads as follows " (setting

the same out in words at length), "75,170. Number of names on the poll-books, 141,672. Number of ballots rejected, 961." The certificate gives the vote of each county separately.

To this statement the following certificate was annexed:

"I do hereby certify that the foregoing is a true, full and correct statement of the result of the election above mentioned, as the same is exhibited by the statements produced and laid before the board of state canvassers, according to law, and that the same exhibits the number of the names of the voters in the poll-books of the counties, respectively, and of the ballots rejected, the whole number of the names of the voters in the poll-books of the several counties, the proposed amendment for which any vote or votes were given, and the whole number of votes given for and against each of said proposed amendments in each county, as they appear by the statements so produced and laid before the said board. In witness whereof I have hereunto set my hand this nineteenth day of October, in the year of our Lord one thousand eight hundred and ninety-seven.

"JOHN W. GRIGGS,
"*Chairman of the Board of State Canvassers.*
"Attest:
"GEORGE WURTS, *Clerk.*"

Then follows a statement:

"A statement of the determination of the board of state canvassers, relative to an election held in the State of New Jersey on the twenty-eighth day of September, in the year of our Lord one thousand eight hundred and ninety-seven, for proposed amendments to the constitution of this state. The said board to determine and declare that at the said election the proposed amendment to the constitution relating to lotteries and gambling, which reads as follows" (setting the same out in words at length), "was adopted. The proposed amendment to the constitution relating to appointment to office,

which reads as follows" (setting the same out in words at length), "was adopted. The proposed amendment to the constitution providing for woman suffrage, which reads as follows" (setting the same out in words at length), "was rejected."

With the following certificate:

" I do certify that the foregoing is a true, full and correct statement of the determination and declaration of the board of state canvassers therein mentioned. In witness whereof I have hereunto set my hand this nineteenth day of October, in the year of our Lord one thousand eight hundred and ninety-seven.

"JOHN W. GRIGGS,
*"Chairman of the Board of State Canvassers.*
"Attest:
"GEORGE WURTS, *Clerk."*

This statement was filed in the office of the secretary of state October 19th, 1897, and the governor issued his proclamation under the great seal of the state, bearing date October 26th, 1897, declaring that the said two proposed amendments above set out (being the amendment to paragraph 2 of section 7 of article 4, and the addition to section 12 of article 5) had been adopted, approved and ratified by the people by a majority of the electors qualified to vote for members of the legislature voting thereon, and that the same have become part of the constitution of this state. This writ was allowed and issued December 3d, 1897. The proceedings contemplated by the act of 1897 for the adoption of the constitutional amendments proposed by that act were completed before this writ was sued out. The case was argued upon the return and the following stipulation of counsel:

" It is stipulated and agreed between the attorneys of the prosecutors and defendant as follows:

" *First.* That the prosecutors are severally citizens and taxpayers of the State of New Jersey, and voted at the special

election held on September 28th, 1897, upon the constitutional amendments.

"*Second.* That over one hundred and fifty thousand voters were registered in the various election districts in the State of New Jersey, at the registration made under the act of May 25th, 1897, for such special election. While admitting the fact the attorney of the defendant will object on the hearing to its relevancy or competency in this case.

"*Third.* That all the ballots cast at said election were printed by the secretary of state under the act of submission of May 25th, 1897, and that no other form of ballot was received by the election officers, except that upon certain ballots cast the first proposed amendment was crossed out by the printing of a black line or lines over the words of said amendment and said ballots were rejected."

Before Justices DEPUE, VAN SYCKEL and GARRISON.

For the prosecutors, *Allan L. McDermott, John P. Stockton* and *William D. Edwards.*

*Contra, Samuel H. Grey,* attorney-general.

The opinion of the court was delivered by

DEPUE, J. The constitutional provision under which the proposed amendments were submitted to the people is article 9, which is as follows: "Any specific amendment or amendments to the constitution may be proposed in the senate or general assembly, and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals, with the yeas and nays taken thereon, and referred to the legislature then next to be chosen, and shall be published for three months previous to making such choice in at least one newspaper of each county, if any be published therein; and if in the legislature next chosen as aforesaid such proposed amendment or amendments, or any of them,

shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the legislature to submit such proposed amendment or amendments, or such of them as may have been agreed to as aforesaid by the two legislatures, to the people, in such manner and at such time, at least four months after the adjournment of the legislature, as the legislature shall prescribe; and if the people, at a special election to be held for that purpose only, shall approve and ratify such amendment or amendments, or any of them, by a majority of the electors qualified to vote for members of the legislature voting thereon, such amendment or amendments so approved and ratified shall become part of the constitution; provided, that if more than one amendment be submitted, they shall be submitted in such manner and form that the people may vote for or against each amendment separately and distinctly; but no amendment or amendments shall be submitted to the people by the legislature oftener than once in five years."

In every government organized under a constitutional form of government the initial steps for a change in the constitution are with the legislative department of the government in which is vested the sovereign power of the people in that respect. I do not refer to a constitution which is the product of revolution, such as that adopted July 2d, 1776. The convention or congress which in its broadest sense made that constitution was assembled without sanction of law. It was composed of delegates who had been elected at the instance of a committee of citizens appointed by the continental congress. Having procured the arrest of the colonial governor (Franklin), his removal from this state and his imprisonment in the State of Connecticut, this body proceeded to frame and adopt a constitution, which was not submitted to the people for ratification and had no other sanction or authority than the concurrence of the convention thus constituted. Nevertheless, from the time that instrument was promulgated until 1844, it was the fundamental instrument of government of this state, submitted to by the legislative, executive and judi-

cial departments of the government, and also by the people of this state, as having the force of a constitution.

The constitution of 1776 made no provision for an amendment of that constitution. During the latter years of its supremacy a new constitution was earnestly advocated; but no one supposed that it was competent for the people to inaugurate measures for the adoption of another constitution without legislative action. Mr. Justice Cooley says: "The will of the people to this end can only be expressed in the legitimate modes by which such a body politic can act, and which must either be prescribed by the constitution whose revision or amendment is sought or by an act of the legislative department of the state, which alone would be authorized to speak for the people upon this subject, and to point out a mode for the expression of their will in the absence of any provision for amendment or revision contained in the constitution." *Cooley Const. Lim.* 40. By an act of the legislature, passed February 23d, 1844, entitled "An act to provide for the election of delegates to a convention to prepare a constitution for the government of this state, and for submitting the same to the people thereof for ratification or rejection," it was enacted that an election should be held for delegates to a convention to frame a constitution; that the said election should be conducted and held by the officers who held the last annual election, except where new officers were elected. It provided for the number of delegates, for the manner of voting and canvassing the result of the election and a certificate of the result. It provided also that when the convention should have agreed upon a constitution it should cause the same to be engrossed, signed by the president and secretary, and delivered to the governor of the state, and filed in the office of the secretary of state. By section 9 it was enacted that, for the purpose of ascertaining the sense of the people as to adoption or rejection of the constitution agreed upon by the said convention, an election should be held in the several counties of this state. Section 1, in its proviso, prescribed the qualifications of voters for the election of delegates, and every person

qualified to vote for delegates to the convention was authorized to vote at the election for the adoption or rejection of the constitution. By section 11 it was provided that the voting at such election should be by ballot; that the ballot of those persons voting for the adoption of the said constitution should contain the word " Constitution," and those against its adoption the words " No Constitution," and in case a majority of all the votes cast should be given in favor of the constitution so submitted it should become and be declared the constitution of this state. By section 12 the election officers were required to make out duplicate returns thereof substantially in the form provided by the act of 1897, one of which should be deposited in the clerk's office and the other transmitted to the governor. By section 13 it was made the duty of the governor to lay the returns of the election before a privy council to be by him summoned for that purpose, and, after casting up the whole number of votes given in the state at such election, the governor and privy council were required to proceed to determine whether a majority of the votes were in favor of or against the adoption of the constitution, and if the governor and privy council should determine that a majority of the votes were cast in favor of the constitution, the governor should issue a proclamation declaring that the constitution had been adopted by a majority of the votes.

The constitution above referred to was adopted by the convention June 29th, 1844, and approved by the people at an election held in August, and the statement of the result of the election by the board of state canvassers was filed in the secretary of state's office August 29th, 1844. The proclamation of the governor, which is the only legal and competent evidence that the constitution ever took effect, was made the same day. It certified, under his privy seal, that the constitution had been adopted by the majority of the votes of the people and that it would take effect and go into operation on the 2d day of September then next. It is the constitution now in force except as subsequently amended, and contains the provision for amendments above set out. Pursuant to

the power of amendment prescribed by article 9, amendments to the constitution have, under legislative authority, been submitted to the people on two previous occasions—in 1875 (*Pamph. L., p.* 72) and in 1890 (*Pamph. L., p.* 483). The act of 1844, under which the present constitution was submitted, illustrates the action of the legislative department of the government with respect to proceedings for the formation of a constitution. It provided for the election of delegates to the convention by a constituency having other qualifications than those prescribed by the constitution of 1776, which was then in force. The property qualification contained in that constitution was eliminated, and in place of a residence within the county for one year preceding the last election, the act of 1844 conferred the right of suffrage upon citizens who resided within the state for one year and in the county for five months next preceding said election, and at the election, for the purpose of ascertaining the sense of the people as to the adoption or rejection of the constitution, every person qualified to vote for delegates to the convention was entitled to vote. The procedure adopted by the legislature for the submission of the constitution of 1844 and the amendments of 1875 and 1890 to the people at an election, the conduct of the election, the form of the ballots to be voted and the mode of canvassing and declaring the result, was, in every material respect, the same as that prescribed by the act of 1897.

The constitutional provisions now in question were submitted to the people by the legislature of 1897. Article 9 prescribes the conditions under which the legislature is authorized to submit proposed amendments to the people. The concurrence of two legislatures in the specific amendments by a majority of the members elected in each house is the condition upon which the legislature is authorized to submit proposed amendments to the people at an election. It is conceded that the proceedings in the two legislatures of 1896 and 1897 were, in all respects, in compliance with the constitutional prescription. The jurisdiction of the legislature of 1897 to provide for the submission of these amendments to

the people was complete.    Consequently, cases cited by coun-
sel such as *Koehler* v. *Hill*, 60 *Iowa* 543 ; 14 *N. W. Rep.* 738;
15 *Id.* 609, do not apply to this case.    The constitution of
Iowa, under which that decision was made, authorized the
submission of an amendment to the people when the same
was agreed to by two legislatures.    The constitutional amend-
ment as agreed to by the last legislature was different from
that approved by its predecessor.    The amendment related
to the prohibition of the sale of liquor.    The resolution
adopted by the first legislature read as follows : " No person
shall manufacture for sale or keep for sale as a beverage or
to be used any intoxicating liquor," &c.    The resolution as
adopted by the succeeding general assembly did not contain
the words " or to be used."    The Supreme Court held that
the constitutional amendment proposed was invalid for the
reason that the adoption of a proposed amendment by two
legislatures was jurisdictional.    No question of that kind
arises in this case.    The argument of counsel proceeds on
the assumption that everything was done that authorized the
legislature of 1897 to submit the proposed amendments to
the people.    The contention is with respect to the validity of
the act of 1897 in other respects and the regularity of the
proceedings of the board of state canvassers in canvassing and
declaring the result of the election.

The contention is that the act of 1897 is in itself unconsti-
tutional.    The reason under which this argument was pre-
sented is in these words : " Because the act of May 25th,
1897, under which said election was held, was unconstitu-
tional and void, being contrary to the provisions of article 9
of the state constitution."    This reason is defective in form,
at least, in that it fails to specify with precision in what re-
spect the act conflicts with the constitutional provision.    But,
waiving that objection, the argument of counsel under this
head will be considered.    It is founded on the proviso to
article 9, " that if more than one amendment be submitted,
they shall be submitted in such manner and form that the
people may vote for or against each amendment separately

and distinctly." The ballot prescribed by the act is in the form following : " For all propositions on this ballot which are not canceled with ink or pencil, and against all which are so canceled." The form of the ballot prepared by the secretary of state, and annexed to the state of the case, conforms to the statute. The ballot is such in form that the voter may vote for or against each amendment separately and distinctly.

The argument is that this form of submission is unconstitutional with respect to such qualified voters as desire to remain neutral as to some one of the amendments submitted and to vote affirmatively for others ; that the legislature may say how the qualified voter shall vote for or against each amendment upon which he desires to vote, but it cannot attach to the doing of it any compulsion to act upon any other amendment. Counsel's argument is presented in his brief in these words : " It will be seen that the law compelled every voter who desired to vote for or against any proposed amendment to also vote for or against the two other propositions. The constitution does not empower the legislature to attach any such condition to the casting of a vote for or against a proposed amendment. The statute cannot say to the voter ' You shall not vote for or against any amendment unless you vote for or against all.' An honest citizen may frankly say ' I do not know whether the amendment is an improvement, and I cannot vote intelligently.' He may ask to be excused. He may say ' This amendment affects me in a degree greater than it does my fellow-citizens, and while I desire its adoption, I do not wish to vote for it.' * * * Can the legislature say to this citizen ' You cannot exercise your intelligent judgment on the proposition you have studied and understand unless you give a guess upon all the others ? ' "

The precedents in this state, from the time of the act of 1844, under which the constitution of 1844 was adopted, to the present time, are in conformity with the present act in this respect. As already observed, the act of 1844 created a constituency for the election of delegates to the convention and for submission to the people with qualifications different from

those prescribed by the constitution then in force, and declared that voting at such election should be by ballot, and that the ballots of those voting for the adoption of said constitution should contain the word " Constitution," and those against its adoption the words "No Constitution." No provision whatever was made for the conscientious voter who favored some of the provisions contained in the constitution and opposed others. By the fiat of the legislature such a voter was coerced into adopting or rejecting the constitution as a whole.

The precedents of amendments submitted to the people, under article 9 of the constitution, are more nearly to the point. The act of 1875, under which twenty-seven specific amendments were submitted to the people, in its third section provided " that at such election each voter may present a ballot on which shall be written or printed, or partly written or partly printed, in the form following, namely, for all propositions on this ballot which are not canceled with ink or pencil, and against all which are so canceled." Section 4 provides that each of said ballots shall be counted as a vote cast for each proposition thereon not canceled with ink or pencil, and against each proposition so canceled ; and the secretary of state, by section 12, was required to prepare and have printed ballots in the form provided by the act. The form of the ballot which voters were required to use was identical with the form prescribed by the act of 1897. An inspection of the several amendments submitted in 1875 will disclose the fact that many of them provided for constitutional powers and limitations diverse in their nature, with respect to some of which the intelligent voter might scruple, although he had studied and approved of others. This is conspicuously the case with paragraph 11, which prohibited private, local or special laws in certain formulated cases. In these instances the qualified voter, if he was in favor of some of the particulars embraced in the paragraph and was opposed or indifferent as to others, could not vote for those that he approved and refrain from voting on those that he opposed or with

respect to which he was indifferent, without voting for or against all that were enumerated in the paragraph as submitted by the legislature.

In 1890 two separate amendments were submitted to a popular vote by the act of June 19th, 1890. *Pamph. L.,* *p.* 483. The mode in which the proposed amendments were submitted to the people was prescribed by section 3, and is identical in form with section 3 of the act of 1897, and section 4, which provided for the counting of the votes, is also identical with section 4 of the act of 1897. If the argument of counsel has substance sufficient to overthrow the act of 1897, it must be equally efficacious with respect to the act of 1844, and also to the act of 1875, and the constitutional amendments which are a prominent feature of our present constitution never acquired the force of fundamental law. It would be no answer to such a conclusion that the amendments of 1875 were adopted by a large majority of votes, for if the submission was in a form interdicted by the constitution the statute which gave life and substance to the popular vote would violate the constitution and be void. For the same reason the amendment submitted at the election under the act of 1897, which received the approval of a majority of over seven thousand, would fall. The ballot prescribed by the legislature in this instance conforms literally to the constitutional requirement, and, if there be any obscurity or uncertainty in its construction, usage and immemorial practice, commencing with the form in which the constitution of 1844 was submitted, and more especially in the manner in which the amendments of 1875 and 1890 were submitted, would fix the interpretation of this constitutional provision. The constitutional amendments of 1875 have been uniformly recognized by the legislative, executive and judicial departments of the government, and also by the people of this state, as a valid exercise of the power of amendment in conformity with a procedure such as is prescribed by the act of 1897. The antecedent precedents on this subject have given a construction to the proviso in article 9, with respect to the submission

of several amendments, of such force as not at this time to be shaken. *State* v. *Wrightson,* 27 *Vroom* 126, 206; *Kenny* v. *Hudspeth,* 30 *Id.* 504, 533.

The constitutional provision in itself gave no consideration for the qualified voter who, for any reason, was indifferent or non-committal with respect to proposed amendments. The approval and ratification of any amendment devolved upon the majority of electors who should vote for or against it. Power to submit proposed amendments to the people was committed to the legislature in such manner as it might prescribe, with the limitation only that if more than one amendment be submitted at the same time they should be submitted in such manner and form as that the people might vote for or against each amendment "separately and distinctly." The ballot adopted in this instance by the legislature and approved by the executive is such in form as is directed by the constitution. Being within the competency of the legislature, it is not competent for the judiciary to set aside the result of an election certified and approved as prescribed by the act, on the assumption that some other form of voting would be preferable or even fairer.

The remaining reasons for reversal relate to the action of the board of state canvassers in determining the result of the election and declaring that the amendment in question was adopted.

The county boards of election complied with the statute in making their statements of the result of the election in the several counties on the basis of the statements of the result of the elections in the several election districts or precincts, certified and returned by the boards of registry and election, and the board of state canvassers also complied with the statute in making their statement of the result of the election throughout the state from the statements of the several county boards which had been filed in the secretary of state's office. The tabulation contained in the statement of the board of state canvassers of the number of names on the poll-books, the number of ballots rejected and the number of votes given for and against each of the proposed amendments is in exact

compliance with the act. The argument of counsel is therefore directed to the result as determined and declared by the board, viz., that the amendment in question was adopted.

It is admitted by counsel that over one hundred and fifty thousand voters were registered in the various election districts of the state at the registration made under the act of 1897 for the special election. It appears by the tabulated statement of the board of state canvassers that the number of names on the poll-books of persons who voted at the election was one hundred and forty-one thousand six hundred and seventy-two. The number of votes given for the amendment in question was seventy thousand four hundred and forty-three. If the determination of the result is made on the basis of a comparison of the votes cast for this amendment with the qualified voters in the state or with the number of voters whose names appear on the poll-books, the amendment did not receive a majority. But, by the constitutional provision under consideration, though the proposed amendment is required to be submitted to the people of the state, the approval and ratification of an amendment depend upon the majority of electors who are not only qualified to vote but do vote thereon at such election. The case relied on by the prosecutors on this subject (*State* v. *Swift*, 69 *Ind.* 505) was decided upon a constitutional provision entirely different from ours. The constitutional provision then under consideration provided for the submission of any proposed amendment " to the electors of the state, and if a majority of such electors shall ratify the same it shall become part of the constitution." The court held that, inasmuch as the adoption of the constitution required a majority of all the electors, a constitutional amendment which received a majority of the votes cast for and against it, but less than a majority of all the electors who voted at the election, was neither ratified nor rejected. By our constitution the canvass of the vote is made on the basis, not of the electors qualified to vote or of the electors who voted at the election, but of the electors who voted for or against the proposed amendment.

To sustain the contention that, in the determination of the board of state canvassers, the number of names on the poll-books, which included the votes given for and against each proposed amendment, as well as the number of ballots rejected, should be considered in ascertaining the majority, *Slingerland* v. *Norton*, 61 *N. W. Rep.* 322, and *Smith* v. *Board of Commissioners of Renville County*, 65 *Id.* 956, were cited. Those decisions were made upon a statute submitting to an election the question of the removal of county seats, which provided that "if fifty-five per cent. of the votes cast at such election shall be in favor of changing the county seat to the place named" the change shall be made. The court, on a construction of the words "votes cast," held that the majority was to be ascertained from all the ballots that were cast at the election, although some of the ballots could not be deciphered or counted either for or against the proposed change of the county seat.

Decisions of which the cases cited are types have no relevancy to the construction of our constitution. The constitutional provision does not require a majority of the voters who are admitted as such at the election and who in fact exercise or attempt to exercise the elective franchise. The certificate of the number of votes received by the several election boards is presumptive evidence that the persons by whom they were cast were qualified voters. But that concession does not dispose of this question. The constitution requires that the approval and ratification of any amendment shall be by a majority of electors who are not only qualified to vote, but who did actually vote upon such amendment—that is, qualified voters whose ballots were entitled by law to be counted in declaring the result of the election either for or against the amendment. Though a qualified voter succeeds in getting his name on the poll-list and a ballot in the ballot-box, he is not a voter voting on the amendments unless his ballot is such as is prescribed by law and conforms to the general law regulating elections. The act contains no provision for the certificate and return of the ballots that were rejected, nor

does it provide for an inquiry either before the county boards of election or before the board of state canvassers with respect to the grounds upon which votes have been rejected, nor are either of these boards empowered to embody in their official action any results other than such as are exhibited by the official statements produced before them. The ballots returned as rejected must be taken to have been properly rejected, and consequently are to be excluded from the computation of the votes cast for or against the amendments. Such ballots were simply nullities.

The power of the legislature to adopt reasonable regulations for the conduct of elections is undoubted. Among the regulations adopted for conducting elections from the earliest period of voting by ballot are those which provide for the manner in which qualified voters shall exercise the elective franchise. Such regulations are necessary to secure fairness and honesty in elections. When the constitution provided for submitting amendments to the people at an election, it must be taken that it was contemplated an election held in conformity with regulations adopted in the act submitting the amendments or by the general laws of the state, and that by electors qualified to vote and voting thereon was meant qualified voters who exercised the elective franchise in such a manner as entitled their ballots to be counted and canvassed in ascertaining the result of the election. The several acts under which constitutional amendments have heretofore been submitted to the people are illustrations of this principle. They provide the form of the ballot that shall be voted and counted as a vote for or against an amendment, and that the manner of voting and the procedure of the election officers should in all respects conform to the requirements of the general law respecting elections except as modified by the act.

We find no imperfections in this act on constitutional grounds, nor in the proceedings of the board of state canvassers, and for that reason the writ of *certiorari* should be dismissed.

But if we had found infirmities in the act on other than constitutional grounds, or in the proceedings of the board, the same result would follow. The constitution prescribes no method for ascertaining or recording the result of the election. That duty is entrusted to the legislature, the representatives of the sovereignty of the people, to provide the means for determining the result of the election and furnishing the evidence that amendments submitted to the people have become part of the constitution as a memorial for all time. The legislature constituted the board of state canvassers the tribunal by which the result of the election should be ascertained, and vested in it the jurisdiction to determine whether any amendment or amendments proposed had been adopted, and gave to the certificate of the board such force and effect that upon filing the same the amendment or amendments so certified to have been adopted should be and become part of the constitution. In order that the certificate of the board of state canvassers should have the sanction of the executive department of the government, and the result so certified be publicly proclaimed, the legislature made it the duty of the governor to issue a proclamation declaring which of the proposed amendments had been adopted by the people. The concurrence of the board of state canvassers and the executive department of the government, in their respective official functions, places the subject beyond the cognizance of the judicial department of the government. The cases to that effect are cited by Mr. Justice Van Syckel in his opinion upon the application for this writ. *Bott* v. *Secretary of State*, 32 *Vroom* 163. It is unnecessary to reproduce these citations. It is sufficient for us to say that after the decision and determination of the board of state canvassers and the proclamation of the governor the matter has passed beyond the reach of the judiciary. If the decision of the state board should be set aside by our judgment the proclamation of the executive would still remain.

The writ should be dismissed.

GARRISON, J. (concurring). I agree with the decision of the court in this case. I concur in the reasons for that decision given in the opinion of Mr. Justice Depue. I do not agree that the decision the court has made is one that is beyond the cognizance of the judicial department. I dissent from the proposition that the legislature can place a question of this sort beyond the reach of the judiciary.